NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

OWNERS MAINTENANCE CORP., Respondent.

No. 855, Docket 77–4217.

United States Court of Appeals, Second Circuit.

Argued May 22, 1978.

Decided July 19, 1978.

Kathy L. Krieger, New York City (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for petitioner.

Marvin Dicker, New York City (Jonathan L. Sulds, Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for respondent.

Before OAKES, Circuit Judge, and BLUMENFELD * and MEHRTENS,** District Judges.

OAKES, Circuit Judge:

This is a petition by the National Labor Relations Board (Board) to enforce [1] an order requiring a building maintenance firm to reinstate with back pay two porters, Thomas Soto and Jaime Veve, employed by the firm at One Penn Plaza in Manhattan at the time of their discharge. The firm, Owners Maintenance Corp. (the Company), a subsidiary of Helmsley-Spear, Inc., provides maintenance services to various buildings in Manhattan. As a member of the Realty Advisory Board, a multi-employer bargaining association, the Company is party to a collective bargaining contract with Local 32B of the Service Employees International Union (the Union). The Board, agreeing with the position of its administrative law judge, determined that the discharges violated Section 8(a)(1) and (3) of the Labor Management Relations Act

---

\* Of the District of Connecticut, sitting by designation.

\*\* Of the Southern District of Florida, sitting by designation.

1. The Board's petition power has its source in Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e).

(Act).[2] The Company opposes enforcement on the ground that the Board improperly declined to defer to an arbitrator's award exonerating the Company. Specifically, the arbitrator held that although the men had been discharged without just cause, they had not been discharged in violation of Section 8(a)(3) and had forfeited their right to reinstatement with back pay by distributing leaflets in support of their grievance. The Company's objections to the Board's petition are unavailing. Accordingly, we grant the Board's petition.

## I.  Facts

Thomas Soto was employed from early May, 1973, until his discharge on July 3, 1975; within a month after his hiring he was promoted to a "position like that of acting foreman." Jaime Veve was hired in January, 1974, and discharged the same day as Soto. Both men had signed job application forms in which they denied ever having been arrested. However, each had been arrested—Soto during labor picketing at Nathan's Restaurant, for trespassing in a Vietnam veterans' demonstration and for marijuana possession,[3] and Veve for the same picketing and for parading without a permit in an antiwar demonstration.[4]

Both men, who were concededly capable employees, educated other employees, particularly those who were Spanish-speaking, as to their rights under the union contract and assisted them in bringing grievances to the attention of the Union which they had joined. They also presented and supported grievances of other employees against the Company in connection with discriminatory work assignments, nepotistic hiring practices, the discharge of a shop steward,[5] and the Company's termination of coffee breaks. In addition, during the three months prior to their discharge, Soto and Veve aided nonunit employees of the Company, including an individual with a grievance over working hours and matrons protesting lower pay for work equal to that of porters. Soto and Veve also compiled contract demands on behalf of the security guards for use in negotiations with the Company. This assistance earned Soto the sobriquet "back door lawyer" by a Company representative.[6] In May of 1975, Soto was formally elected shop steward.

At about the same time, the Company began investigating the two men. The investigation was initiated by John Cuomo, a police force veteran newly made director of security at One Penn Plaza. The proffered justification for the investigation was a supposed anonymous phone call suggesting that Soto and Veve were involved in thievery in the building and were "bad people—associated with bad groups." The two activists were maintained under surveillance, but not just in their daily duties; Cuomo personally observed Soto's loft building at West 21st Street and described it as "very suspicious." He also obtained from a police department source the "yellow sheets" which supposedly contained Soto's and Veve's arrest records and erroneously reported to the Company that Soto had previously been implicated in a heroin sale.

Although Helmsley-Spear officials had not been concerned with transfers of the

---

**2.**     (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.     .     . .     .     .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

.     .     . .

29 U.S.C. § 158(a)(1), (3).

**3.**   Soto's arrest at Nathan's resulted in a $25 fine; the trespass and marijuana charges were dropped.

**4.**   Veve's picketing charge was "adjourn[ed] on conditional discharge"; the antiwar demonstration led to a $10 fine.

**5.**   The steward was subsequently reinstated. Soto and Veve had organized support by other employees on his behalf. .

**6.**   Soto and Veve assisted other employees with various grievances. These included grievances with respect to seniority rules, a foreman's pay, and harassment of one employee, and organizing the porters so as not to break a strike of freight elevator operators.

One Penn Plaza maintenance employees in the past, Helmsley-Spear Property Manager Isolini referred in a June 18 memo to Company Vice President Muller to "the continuing problems" the Company had been having with Soto and Veve and requested their transfer. Two weeks later, on July 3, 1975, Soto and Veve were discharged for "falsification of records."

The two employees filed a grievance alleging the illegality of their discharge. On July 9, 1975, they distributed a leaflet [7] to the public on the sidewalk in front of the entrance to One Penn Plaza. They distributed another leaflet in early October indicating that an arbitration hearing was scheduled for October 7, 1975, and requesting "fellow working people" to "please help Tommy Soto and Jaime Veve get their jobs back." The second leaflet also contained an open letter to the arbitrator from "over 20 members of Local 32B—names withheld for fear of repression." Soto distributed this leaflet at 420 Lexington Avenue, where the shop steward that he and Veve had helped

had been transferred, and at the Helmsley-Spear offices on 42nd Street.

## II. Proceedings Below

On April 13, 1976, the contract arbitrator rendered his opinion and award. He found that the "falsification of job applications did not constitute just cause for discharge," principally on the nonreliability of the anonymous tip, the incomplete and inaccurate investigation and the Property Manager's memorandum of June 18. But he found that the discharges were not unlawful within Section 8(a)(3) of the Act on the wholly speculative basis that "[t]he Company may have had many other reasons for discharging the grievants which it chose not to air during the proceeding." And he found on the authority of *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), that the post-discharge, pre-arbitration leafletting was not protected activity under Section 7 of the Act [8] and

7. Captioned "What Is the Real Reason for Firing These Two Workers?," the leaflet read in pertinent part:

On Thursday, July 3, 1975, just before the July 4th weekend, two Puerto Rican porters were fired from the building at 1 Penn Plaza. The building management . . . fired Jaime Veve, the porter who cleans the outside of the building and Tommy Soto, the shop steward who takes care of the bathrooms in the building. The pretext for the firing was "falsification of records", with no further explanation or specifics given at the time of the firing.

Both Jaime Veve and Tommy Soto were the first Puerto Rican porters in the day shift in the building. From the very beginning of their employment they worked together with other employees to improve the working conditions and end all discriminatory practices directed against the employees of the building by Helmsley-Spear and the Owners Maintenance Company.

. . . . . . .

These two brothers have fought for the rights of all workers. When the company harassed and threatened or fired a worker unjustly, or violated the contract of the guards, of the porters, of the matrons, or of any other workers, Jaime and Tommy assisted the injured party in going to the union for relief. Recently, when the guards [sic] contract expired they helped the guards draw up a set of demands for the new contract. For

this, the company has spread rumors about them and has vowed to get rid of them.

The real reason that brothers Jaime Veve and Tommy Soto have been fired from the day shift of porters is because these workers have challenged the racist, discriminatory, anti-labor, anti-woman practices in the building. Because they have dared to attempt to organize the workers in the building to stand up for their rights as humans. Don't let these brothers be railroaded out of a job during these extreme times of economic crisis by false charges. The OMC and H–S, Inc. cannot find one ounce of dissatisfaction with the actual work of these two employees therefore they have resorted to these phoney charges of falsification of records after Jaime Veve has been working for over one year and Tommy Soto has worked for over two years in the building.

Fellow working people of the building and the adjoining area please help Tommy Soto and Jaime Veve get their jobs back.

To help Jaime and Tommy call [Soto's home number].

8. Section 7, 29 U.S.C. § 157 provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mu-

constituted "gross disloyalty toward the Company" justifying denial of reinstatement. He awarded Soto and Veve back pay but only from July 3 to July 9, 1975, when they first engaged in leafletting. *See* note 7 *supra.*

The Board, adopting its administrative law judge's opinion, refused to defer to the arbitrator's award because it was repugnant to the policies and purposes of the Act. The Board concluded that Soto and Veve were discharged because of their union and concerted activities and that their leafletting was protected by Section 7 of the Act.

### III. Discussion

We reach our conclusion to enforce the Board's petition for several reasons. First, there is no requirement that the Board mechanically defer to an arbitration award. Second, substantial evidence supports the Board's conclusion that the Company violated Section 8(a)(1) and (3) of the Act. And finally, we believe that the post-discharge, pre-arbitration . leafletting was protected concerted activity and did not constitute gross disloyalty.

### A. *Deferral to the Arbitrator.*

We find no requirement of law that the Board must invariably defer to the decisions of arbitrators. The mere presence of an arbitration award does not oust the Board's jurisdiction to adjudicate unfair labor practices on the same subject matter. *See NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 678–79 (2d Cir. 1971). To be sure, the Board has developed a policy of deferring if the arbitration "proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." *Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080, 1082 (1955); *see Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 270–72, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964) (approving

Board's limited, voluntary deferral policy). But we agree with *Dreis & Krump Manufacturing Co. v. NLRB,* 544 F.2d 320, 330 (7th Cir. 1976), that the Board may reject "an arbitral award which condoned an unfair labor practice as repugnant to the purposes and policies of the Act." Here, as we explain below, the arbitrator's findings were facially unsound; the Board was thus entitled to disregard them.

### B. *Section 8(a)(1) and (3).*

Substantial record evidence supports the Board's finding that the Company violated Section 8(a)(1) and (3) of the Act by discharging and refusing to reinstate Soto and Veve. The evidence suggests that the two men were discharged because they engaged in union and protected activity. Both employees had worked satisfactorily for two years and one and one-half years respectively; the stated reason for the discharge—falsified applications—was, as found by the arbitrator, insufficient. The discharge came after aggressive union activity and enforcement of the collective bargaining agreement, including concerted activity in assisting aggrieved non-unit employees and in aiding security guards in their collective bargaining. In addition, there were admonitions to these two employees to mind their own business, a reference to Soto as the "back door lawyer" for the guards, the pretextual investigation and discharge, and the reference in the Property Manager's memorandum to them as "continuing problems." Bearing in mind that "inferences of probability [may be] drawn from the totality of other facts," *NLRB v. Park Edge Sheridan Meats, Inc.,* 341 F.2d 725, 728 (2d Cir. 1965), *quoted in NLRB v. Long Island Airport Limousine Service Corp.,* 468 F.2d 292, 295 (2d Cir. 1972), and that our standard of review of Board action is narrow, *NLRB v. Advanced Business Forms Corp.,* 474 F.2d 457, 464 (2d Cir. 1973); *NLRB v. Gladding Keystone Corp.,* 435 F.2d 129, 131–32 (2d Cir. 1970), it

tual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring mem-

bership in a labor organization as a condition of employment as authorized in section [8(a)(3)] of this title.

is clear that the Board's conclusions were supported by the record and that its refusal to defer to the arbitrator was proper.

In reaching an opposite conclusion, the arbitrator erred in at least two respects. First, he held that the discharge did not violate Section 8(a)(3) because it was not a discrimination based on union *membership*. See *American Ship Building Co. v. NLRB*, 380 U.S. 300, 311, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Not only was there sufficient evidence for the Board to disregard this. conclusion, but the arbitrator completely overlooked a possible Section 8(a)(1) violation: discouragement of union membership is the gravamen of only Section 8(a)(3) whereas Section 8(a)(1) makes it an unfair labor practice to restrain or coerce employees in the exercise of their Section 7 *activities*. Clearly, there was ample evidence to justify the inference that the Company wanted to rid itself of these thorns in its side. Second, the arbitrator erred in unnecessarily speculating that unidentified reasons for the discharge may have existed. However, union activity and falsified applications were the only two conceivable causes with any basis in the evidence presented. The arbitrator's speculation was, therefore, improper. The Board was not required to indulge his speculation and the evidence certainly justified its refusal to do so.

## C. *Leafletting and Section 7.*

There remains the question whether Soto's and Veve's post-discharge leafletting was concerted activity protected under Section 7 of the Act, see note 8 *supra*, and the related question whether the Board was bound to defer to the arbitrator in this respect. The "concerted activities" protected by Section 7 have been broadly construed to encompass individual efforts to initiate collective activity or to vindicate contractual rights by complaining or grieving, e. g., *Owens-Corning Fiberglass Corp. v. NLRB*, 407 F.2d 1357, 1365 (4th Cir. 1969); *NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 499–500 (2d Cir. 1967), and to embrace the enlistment of employee support for one's grievance which is being pressed through the union's grievance machinery, e. g., *Dreis & Krump Manufacturing Co. v. NLRB, supra*, 544 F.2d at 326–29. See Lopatka, *Protection Under the National Labor Relations Act and Title VII of the Civil Rights Act for Employees Who Protest Discrimination in Private Employment*, 50 N.Y.U.L.Rev. 1179, 1184–87 (1975). Here Soto and Veve sought to organize and obtain concerted employee support through the distribution of leaflets.

*Emporium Capwell Co. v. Western Addition Community Organization, supra*, relied on by the arbitrator for his conclusion that the activity was not protected, is clearly distinguishable. There, minority employees repudiated a contractual grievance mechanism and sought to compel separate bargaining by exerting economic pressure through picketing the company's store and through leafletting which called for a boycott.[9] Here, the goal of the leafletting campaign was not separate bargaining but the enlistment of support for the employees' rights in the grievance proceeding. Soto and Veve did not seek to undermine the established contractual grievance mechanism but rather to make effective use of it.[10]

Nor did the leafletting constitute "gross disloyalty" and thereby justify the denial of reinstatement. Although conducted at the front of One Penn Plaza (and elsewhere) and containing some strong language,[11] the leaflets nevertheless related directly to a legitimate grievance—the discharge—and disclosed the nature of the pending labor dispute. *Cf. Community Hospital of Roa-*

---

9. For a discussion of the *Emporium Capwell* case, see Lopatka, *supra*, 50 N.Y.U.L.Rev. at 1187–90.

10. The second leaflet referred to successful grievances aided by Soto and Veve and deplored the Company's attempts to undermine the established mechanism by intimidation.

Again, Soto and Veve did not seek separate bargaining; instead they sought to utilize established channels.

11. The leaflets referred to "a campaign of terror and harassment against Employees who support Tommy and Jaime."

**50**

noke Valley, Inc. v. NLRB, 538 F.2d 607, 610 (4th Cir. 1976) (nurse's activity not disloyal despite dissatisfaction with hospital policies and staffing expressed on television).

The activity did not fall within any of the well recognized exceptions or conceivable extensions of those exceptions to Section 7's protection. Soto and Veve did not disparage the employer's products or services—unlike the leaflets in NLRB v. Local Union No. 1229, IBEW (Jefferson Standard Broadcasting Co.), 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953).[12] Neither did the leaflets contain deliberate or reckless untruths, Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 61, 63, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), nor were they so violent or so serious as to render the employees unfit for further service, Dreis & Krump Manufacturing Co. v. NLRB, supra, 544 F.2d 329. See Lopatka, supra, 50 N.Y. U.L.Rev. at 1201–14.

■ Because the leafletting was related to a pending grievance and did not forfeit its Section 7 protection by the manner in which it was carried out, the Board was justified in concluding that the leafletting was protected Section 7 activity.[13] To hold otherwise is repugnant to the policies and purposes of the Act since the activity here involved is "fundamental" in nature. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Thus the Board need not, as we have said, have deferred to the arbitrator's misguided decision.

Accordingly, the Board's order granting reinstatement with back pay and posting of usual notices is hereby enforced.

Petition to enforce granted.

---

12. Since the business of the Company is to supply building maintenance services (although the business of Helmsley-Spear is to rent and manage buildings), any disparagement that could occur by distributing leaflets in front of One Penn Plaza is highly speculative indeed.

13. We need not determine whether Soto and Veve owed a duty of continuing loyalty to the Company once they were discharged, by virtue of their invocation of the grievance machinery.