NATIONAL LABOR RELATIONS
BOARD, Petitioner,
and

Leigh Benin, Faustino Vargas, and
Laszlo Berkovits, Intervenors,
v.

NEW YORK UNIVERSITY MEDICAL
CENTER, Respondent.

No. 450, Docket 82–4137.

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1982.

Decided Jan. 21, 1983.

Richard A. Semeraro, New York City (S. Andrew Schaffer, New York City, on the brief), for respondent.

Lawrence E. Blatnik, Atty., NLRB, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Dep. Gen. Counsel, Robert E. Allen, Assoc. Gen. Counsel, Elliott Moore, Dep. Assoc. Gen. Counsel, and Andrew F. Tranovich, Atty., NLRB, Washington, D.C., on the brief), for petitioner.

David M. Rosoff, New York City, for intervenors.

Before TIMBERS, KEARSE, and PIERCE, Circuit Judges.

TIMBERS, Circuit Judge:

This case brings sharply into focus the propriety of the *Wright Line*[1] test of the

1. *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980).

National Labor Relations Board (Board) for evaluating mixed motive discharges. The Board applies, pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. §§ 151, 160(e) (1976) (Act), for enforcement of its order, 261 N.L.R.B. No. 118 (1982), issued against New York University Medical Center (Center). The Board found that the Center had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1976), by disciplining three employees for engaging in protected leafleting activity. The Center initiated disciplinary proceedings in the wake of the first contested leafleting incident, took further action after subsequent leafleting, and took final action after two employees had engaged in picketing to protest the prior disciplinary actions.

Applying its *Wright Line* test, the Board found that the General Counsel had made out a prima facie case of unlawful motivation and that the Center had not sustained its consequent burden of proving that it disciplined the employees for a legitimate reason, namely, the alleged unprotected picketing. The Board, therefore, did not have to reach the question whether the picketing was protected activity under the Act. Accordingly, it ordered that one discharged employee, Leigh Benin, be reinstated with backpay and that disciplinary measures taken against two other Center employees, Laszlo Berkovits and Faustino Vargas, be rescinded.

Since we hold that the leafleting was protected activity under the Act, we are prepared to enforce so much of the Board order that countermands the disciplinary measures taken in direct response to the leafleting. Since we further hold, however, that the Board's *Wright Line* test is not the appropriate legal standard for assessing the final disciplinary action taken after the picketing, we remand for further proceedings and we retain jurisdiction pending the Board's further order.

## I.

During September 1979 elections were scheduled by District 1199, National Union of Hospital and Health Care Employees (Union) at the Center to choose delegates to the national convention of the Union's parent organization. Balloting for employees in the Center's Guild Division was scheduled for September 18 and in the Hospital Division one week later. The three employees in question—Vargas, Benin, and Berkovits (all technicians)—were dissident members of the Union who belonged to a splinter national political organization called the Committee Against Racism (CAR). The CAR faction of the Union, along with employees aligned with members of the Progressive Labor Party, decided to present a slate of its own candidates in opposition to a delegate slate comprised mainly of incumbents.

The dissident slate received sixty percent of the vote in the first round on September 18. To continue the momentum generated by the election results, those supporting the CAR slate initiated an aggressive leafleting drive, a tactic it had used intermittently in the past, to garner support from the Center's employees. CAR supporters passed out several leaflets to the employee electorate asking for its votes. One leaflet incurred the Center's wrath because of the way it depicted recent searches of Black and Hispanic employees by the Center's security guards:

"The bosses are making it harder for us everyday! Every pay check buys less food and other necessities! 26 hospitals have closed, costing thousands of jobs. At NYU harassment (for calling in sick, etc.) and arbitrary firings have increased tenfold. And the NYU bosses have turned their security guards into a fascist gestapo illegally searching workers and firing them.

"The bosses inflation, hospital closings, layoffs, harassment, and firings have hit lower paid, mainly black and latin workers hardest. At the same time the bosses are building up Klan and Nazi 'white power', punks to further divide us. All of this builds fascism, which will put all workers in chains. We must fight racism to unite workers against the bosses growing fascism.

"In all of this, the leadership of 1199 from Davis down to Punk dis-organizer Roger Hayes have allowed the bosses to walk all over us. By refusing to fight and blocking those of us who are willing to fight the bosses, Davis and Co. are helping the bosses to build fascism.

"Moreover, while CAR has been organizing workers, on a multi-racial basis, to beat up the segregationist Klan all over the country, Davis has built segregation into 1199 by setting up Divisions that separate nurses aides, building service, kitchen, central service, etc.—(Hosp. Div.) who are almost 100% black and latin, from technicians, social workers, etc.— (Guild) half of whom are white. The lower paid Hospital Div. workers are discriminated against by the 1199 contract. They work 37½ hours and get 2 weeks vacation, while ⅔ of the Guild work 35 hours and get 4 weeks vacation. 1199's percentage raises also give less to lower paid workers. We are organizing a campaign to abolish these racist divisions in order to unite 1199ers.

"On Tuesday, Sept. 18th NYU Guild Div. 1199ers voted for the CAR–PLP slate (# 2) by a 60% majority! WE URGE HOSPITAL DIVISION MEMBERS TO VOTE SLATE 2 AT THE 1199 MEETING on Tuesday, Sept. 25th at 7:30AM, 2:PM, 4:PM in I.R.M. Room 610A (take the elevator in IRM to the sixth floor and walk like you are going to first ave.)

"Turn 1199 into an anti-fascist union led by the anti-racist rank and file."

In response, the Center sent warning letters to Benin and Vargas advising them that their participation in the leafleting warranted discipline and that resumption of similar activity would be ground for suspension or discharge. The two employees countered by filing a grievance on October 2, asserting that the Center had no cause to issue the warning letters.

These two employees, along with Berkovits, subsequently assisted in preparing and/or distributing another leaflet. The leaflet reported the election results, disclosed that Benin and Vargas had received warning letters, and repeated the accusation concerning the searches by the Center's security guards:

"In the past two weeks three important things have happened at N.Y.U. On Sept. 18 Committee Against Racism's (CAR) Slate 2 won the election in the Guild Division (the election for delegates to the 1199 constitutional Convention). On Sept. 25 the union misleadership organizer, Roger Hayes, stuffed the ballot box in the Hospital Division election with 44 extra votes. On Sept. 28 the N.Y.U. management gave correction notices to the two main leaders at N.Y.U. of the International Committee Against Racism, Leigh Benin and Sam Vargas, Slate 2 candidates....

"Why is the N.Y.U. management trying to harass us? It is to try to intimidate N.Y.U. workers and fire Sam Vargas, Committee Against Racism member, and Leigh Benin, CAR and PLP member. It is because N.Y.U. workers led by CAR have shown that we can take the bosses head on: we fought and won against some racist firings and we are making headway in turning 1199 into a militant, anti-racist union by destroying all the racist divisions in the union to unite us into a powerful multi-racial union.

"We reaffirm our charge that the N.Y.U. management is using the security guards for fascist gestapo tactics to intimidate black and Spanish workers. (Some security guards are opposed to this.) For example, Thurs, Sept 27, a Spanish kitchen worker was taken from the door beside the Emergency Room exit and taken to the Security guard's office and searched thoroughly. They found nothing!

\*    \*    \*

"If the N.Y.U. management feels threatened, it has reason to be because we mean business!"

On October 5, the Center suspended Benin because of the leafleting activity.

In protest, Benin and Vargas, along with other individuals associated with CAR,[2] picketed in front of the home of the Center's assistant administrator, Safian, on October 8. Apparently the employees believed that Safian had played a significant role in meting out the discipline. Benin carried a sign stating that Safian was guilty of unfair labor practices. Vargas' sign announced an upcoming CAR rally. Although Vargas and Benin never intruded upon the administrator's property, at least one of the other picketers did, leaving two signs on the mailbox. One read, "Safian, You Fascist We'll Burn You into Ashes". The other read, "Safian Uses Fascist Tactics Against Workers."

The Center discharged Benin on October 11. The telegram notifying him of his dismissal stated:

"You are hereby terminated from your employment at New York University Medical Center for threatening a Medical Center Administrator and his family and engaging in intimidating behavior outside his house on October 8, 1979.

"Your recent activity in distributing leaflets containing inflammatory and baseless charges which incited employees and disparaged the good name and reputation of the Medical Center was also considered in reaching the decision to discharge you."

The Center also suspended Vargas for similar reasons. It issued a warning letter to Berkovits for his involvement in distributing the most recent leaflet. The Center's Discipline and Grievance Administration Policy outlined a progressive discipline approach. The first step consisted of a warning, the next a suspension, and, finally, discharge. The policy, however, specifically allowed for earlier discharge if the situation so warranted. Vargas and Benin filed grievances.

The grievances of Benin and Vargas were referred to arbitration in accordance with the collective bargaining agreement. Var-

gas withdrew from the arbitration on March 13, 1980, after two days of hearings. The arbitrator, in a decision dated May 20, 1980, ruled that the warning letter issued to Benin, his suspension, and his discharge were for just cause. Specifically, the arbitrator ruled that the contents of the leaflets were inflammatory, irresponsible, and hence unprotected under the Act.

The General Counsel of the NLRB filed a complaint alleging that the Center's disciplinary measures violated § 8(a)(1) of the Act. After a hearing, the ALJ, with the Board's subsequent sanction, determined that the Center had violated § 8(a)(1) by issuing the written warnings to all three employees, suspending two of the employees, and discharging one for engaging in the protected leafleting activity. The Board did not determine whether the picketing was protected since it found that the leafleting was a "motivating factor" in all of the disciplinary stages, and that the Center had not proven that it would have pursued the same course of action were only the picketing involved. The Board's remedial order directed the Center to cease and desist from committing the unfair labor practices, to reinstate Benin with backpay, to compensate Vargas and Benin for losses sustained as a result of the suspensions, and to rescind the warning letters.

## II.

We must determine initially whether the Board's decision not to defer to the arbitrator's award was proper. In *Liquor Salesmen's Union Local 2 v. NLRB,* 664 F.2d 318, 326 n. 3 (2 Cir.1981), *cert. denied,* 456 U.S. 973 (1982), we recently reiterated that an "abuse of discretion" standard is appropriate in reviewing Board decisions enforcing or overturning arbitration awards. *See also NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 678–79 (2 Cir.1971). Although the Board defers as a matter of discretion to arbitrators' decisions issued pursuant to collective bargaining agreements,[3] *Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080

---

2. The group consisted of eleven adults and four children.

3. The Board's discretionary policy stems from the national labor goal of encouraging private

(1965), it will defer only if (1) the proceedings appear to have been fair and regular; (2) the parties agree to be bound by the arbitration;[4] and (3) the decision is not clearly repugnant to the purposes and policies of the Act. *Id.* at 1082.[5] Applied to the facts of this case, the Board claims that the arbitrator's award was contrary to the policies of the Act.

The Board defends its decision not to defer on the ground that the leaflets clearly deserved protection under the Act. The Board is certainly correct that the arbitrator did not consider the *rhetorical* nature of the language used in the leaflets and, as we shall discuss in Part III, *infra,* the leaflets do merit protection under the Act. While the arbitrator's opinion cannot be said to ignore pertinent law or to misread the record, we hold that the Board's conclusion that it was repugnant to the Act is not an abuse of discretion. *NLRB v. Owners Maintenance Corp.,* 581 F.2d 44, 48 (2 Cir.1978) ("the Board may reject 'an arbitral award which condoned an unfair labor practice as repugnant to the purposes and policies of the Act' "). Thus, the propriety of the Board's § 8(a)(1) determination with respect to the discipline of the three employees is squarely before us.

### III.

Employees' leafleting generally constitutes concerted activity for the purpose of "mutual aid and protection" within the meaning of § 7 of the Act. 29 U.S.C. § 157 (1976). Dissemination of information lies at the core of the protections afforded statutory employees, *NLRB v. Magnavox Co.,* 415 U.S. 322, 325 (1974), and leafleting may be one of the most effective means of attaining that end. The Center does not dispute that its employees have the right to leaflet,

or that the leaflets actually distributed were directed to other employees. Rather, it asserts that the contents of the leaflets in question strip the activity of the Act's protection. It argues, first, that the leaflets contained provocative language which was disruptive of discipline; second, that the leaflets contained falsehoods published in reckless disregard of the truth; and, third, that they manifested disloyalty to the employer and hence lost all protection under the Act.

The Center's characterization of the leaflets as provocative is certainly apt. The leaflets likened the Center to the "gestapo", and accused it of implementing fascist tactics. Because of the provocative language used, the Center argues that the leaflets should not be protected under the Act. It premises its argument on *Southwestern Bell Telephone Co.,* 200 N.L.R.B. 667 (1972), in which the Board held that an employer lawfully forbade employees from wearing sweatshirts with the provocative slogan, "Ma Bell is a Cheap Mother". In a similar case, the Sixth Circuit disagreed with the Board and upheld an employer's decision to forbid its employees from publicizing a grievance by wearing a shirt lettered, "I'm tired of bustin' my ass". *Borman's Inc. v. NLRB,* 676 F.2d 1138 (6 Cir.1982) (decided on ground that wearing of T-shirt did not constitute exercise of § 7 right); *see also Boaz Spinning Co. v. NLRB,* 395 F.2d 512 (5 Cir.1968) (denying enforcement of Board order reinstating an employee who accused the plant manager in presence of other employees at a meeting of being "no different than Castro"). The Center argues that epithets of "fascist" and "gestapo" are even more objectionable than the slogans found unprotected in *Southwestern Bell* and *Borman's.*

resolution of disputes. *See, e.g., United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 (1960).

**4.** Only Benin could be bound by the arbitrator's decision since Berkovits never submitted his

grievance to arbitration and Vargas withdrew his grievance before the hearing had concluded. *See, e.g., Kansas City Star Co.,* 236 N.L.R.B. 866, 867 n. 1 (1978).

**5.** The Board's *Spielberg* doctrine received apparent sanction in *Carey v. Westinghouse Elec. Corp.,* 375 U.S. 261, 270–72 (1964).

Yet the critical question is not merely whether the leaflets are provocative, but whether the provocation could be expected to threaten plant discipline. For instance, in *Southwestern Bell* the Board upheld the employer's discipline not because of the language itself but because the slogan could reasonably be perceived as a threat to plant discipline: "Respondent 'was under no compulsion to wait until resentment piled up and the storm broke before it could suppress the threat of disruption by exercising its right to enforce employee discipline'". 200 N.L.R.B. at 671 (citation omitted). In *NLRB v. Owners Maintenance Corp.,* supra, we also emphasized that an employee's objectionable language must be analyzed for its likely impact on the workplace. 581 F.2d, at 50. Opprobrious language during the course of otherwise protected activity remains "likewise protected unless found to be 'so violent or of such serious character as to render the employee unfit for further service'". *Dreis & Krump Manufacturing Co. v. NLRB,* 544 F.2d 320, 329 (7 Cir.1976).[6] Thus, we must determine if the language in the leaflets was likely to produce misconduct or generally disrupt discipline.

We do not believe that the words by themselves were so offensive as to jeopardize plant discipline. As the Supreme Court remarked in the context of a defamation action, federal law gives a union the "license to use intemperate, abusive or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *National Association of Letter Carriers v. Austin,* 418 U.S. 264, 283 (1974). Indeed, use of the epithet "fascist" was held protected in *Cafeteria Employees Union, Local 302 'v. Angelos,* 320 U.S. 293, 295 (1943), as was the charge of "racist" in *NLRB v. Owners Maintenance Corp., supra,* 581 F.2d, at 47 n. 7, 49–50. Although accusations of "gestapo-like tactics" should not be taken lightly, the Center has not produced any evidence that it had a reasonable expectation that misconduct would ensue.

The Center insists that the leaflets advocate violence. From its perspective, the first leaflet's call for "beat[ing] up the segregationist Klan", juxtaposed with the attack upon the "bosses [for] building up Klan and Nazi 'white power' punks", threatened violence, as did the second leaflet's conclusion, "If the N.Y.U. management feels threatened, it has reason to be because we mean business." Fairly viewed, we believe that the leaflets taken as a whole simply did not exhort the employees to violence. The reference to beating up the Klan does not suggest that the administration would be an appropriate target for retributive rage, and the statement "we mean business" in context seemingly refers to the prior discussion of the need for defending employee rights vigorously. Indeed, the leaflets employ rhetoric unexceptional for a splinter political group. Testimony was presented at the hearing that the group had passed out similar leaflets earlier with no adverse administrative reaction.

Moreover, the Center's argument takes the leaflets completely out of context. The principal aim of the first leaflet was not to provoke other employees against management, but to curry favor among potential voters for the dissident slate. The CAR faction wished to appear as militant as possible, hoping eventually to wrest leadership of the Union from the incumbents. The leaflet did identify issues pertinent to employees' working conditions—inflation and the alleged searches of minority workers. The second leaflet similarly sought to garner support for the dissident faction. It protested the Center's decision to mete out discipline in the wake of the first leaflet, and reasserted the charge that the Center's security guards had carried out illegal searches. Challenges to the incumbent union's performance as collective bargaining representative fall within the ambit of § 7

---

**6.** Most of the cases in which the objectionable language has been found unprotected have been marked by obscenities, *see, e.g., Sullair P.T.O., Inc. v. NLRB,* 641 F.2d 500, 502–03 (7 Cir.1981); or sexual innuendo, *see Southwestern Bell, supra.* There is no contention that the leaflets here contained such language.

protected activities. *See Eastex, Inc. v. NLRB,* 437 U.S. 556, 574 & n. 23 (1978); *NLRB v. Transcon Lines,* 599 F.2d 719, 721 (5 Cir.1979).

█ Both leaflets, therefore, primarily attempted to rally employees to the dissident side and not to incite employees against the Center. There had been no history of violence at the Center and no showing of incipient labor-management strife. The leaflets did not pose a continual challenge to the administration's authority in the same sense as did the slogan "Ma Bell is a Cheap Mother" emblazoned across the employees' sweatshirts in *Southwestern Bell.* Nor was there the same potential for friction as with shirts advertising "I'm tired of bustin' my ass" in *Borman's.* Unlike the situations in these two cases, the alleged incendiary language in the leaflets in the instant case was directed at fellow employees and the presence of the leaflets did not serve as a constant irritant in the same way as the clothes worn in *Borman's* and *Southwestern Bell.* The leafleting was an essential means to enable the dissident faction to communicate with the rest of the rank-and-file. We hold that substantial evidence supports the Board's determination that the objectionable language in the leaflets posed no danger of breach of employee discipline.

The Center also argues that, irrespective of the terms used in the leaflets, assertions that the Center's security personnel illegally searched employees are tantamount to charges of criminal assault and battery, and hence should be unprotected. We are not persuaded that the leaflets contained such defamatory attacks.

█ In *Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53 (1966), the Supreme Court set forth the pertinent standard for assessing defamatory statements in the labor-management relations context. Erroneous assertions lose their protected status only when they are published with "knowledge of their falsity or with reckless disregard of whether they were true or false." *Id.* at 65 (basing standard on *New York Times Co. v. Sullivan,* 373 U.S. 254 (1964)). Although *Linn* involved a civil libel suit, we previously have applied its standard in the broader context of employee protected activity under § 7 of the Act, *Montefiore Hospital & Medical Center v. NLRB,* 621 F.2d 510, 516–17 (2 Cir.1980), and we hold it to be controlling in this case. *See also Linn, supra,* 383 U.S. at 61 (acknowledging that Board utilized standard in § 7 context).

█ Applying the *Linn* standard, we hold that the assertions concerning searches of minority employees by the Center's security guards were not levelled in reckless disregard of the truth. The Center does not dispute that the searches took place. Benin, Vargas, and Berkovits testified at the hearing that they had received reports of the searches from other employees, including some of the employees allegedly searched. In addition, they identified several of the employees who had furnished the information. The Center never produced any witnesses to rebut the employees' testimony. While Center personnel testified that searches were carried out pursuant to established Center regulations and that they were not discriminatory, their testimony did not demonstrate that the leaflets showed utter indifference to the truth. To be sure, the employees should have investigated further before disseminating rumors of the searches, and their failure to institute grievance proceedings or even approach the administration concerning the searches casts doubt upon their good faith. Yet there is no evidence that they distorted the reports they received from fellow employees. No material, deliberate misstatements were made.[7] The charges merely

---

**7.** The Center points to two particular statements in the leaflets which it claims were deliberately false—the assertion in the first leaflet that guards were "firing" workers and the assertion in the second leaflet that a "Spanish kitchen worker was taken from the door beside the Emergency Room exit and taken to the security guard's office and searched thoroughly." The Center's argument, however, is not persuasive. Although security personnel do not have the actual authority to discharge employees, their reports, based on searches, can

manifested the rhetoric characteristic of other parts of the leaflets. As the Supreme Court has stated:

"Labor disputes are ordinarily heated affairs ... characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language."

*Linn, supra,* 383 U.S. at 58. Therefore, we hold that the Board's determination that the leaflets were not defamatory is supported by substantial evidence, and consequently the assertions of searches do not remove the leaflets from the Act's protection under § 7.

■ Finally, we are not persuaded by the Center's attempts to characterize the leafleting as "disloyal" under the Supreme Court's decision in *NLRB v. Local Union No. 1229, I.B.E.W. (Jefferson Standard Broadcasting Co.),* 346 U.S. 464 (1953). To be disloyal, employees' conduct must publicly disparage the employer's product. *Id.* at 471–72; *Misericordia Hospital Medical Center v. NLRB,* 623 F.2d 808, 813–15 (2 Cir.1980). The leaflets, directed at fellow employees, related to up-coming union elections. They made no comment about the quality of the Center's medical services. Thus, they did not constitute disparagement of the employer's product.

■ We therefore hold that the leafleting warrants protection under the Act. Any discipline that stemmed directly from this concerted protected activity violated § 8(a)(1) of the Act. Since the leafleting was the acknowledged predicate for the warning letters and initial suspension of Benin, we are prepared to enforce that part of the Board order requiring the Center to rescind the warning letters and to compensate Benin for the suspension.

produce the same result. The leaflet seems to imply that correlation. Similarly, the kitchen worker may never have told Vargas that he

### IV.

Before we may enforce the Board's order in full, however, we must be satisfied that the Center decided upon its final disciplinary steps—discharging Benin and suspending Vargas—because of the employees' participation in the protected leafleting activity. Under the Board's *Wright Line* test for assessing mixed motive discipline decisions, the General Counsel's presentation of a prima facie case of unlawful motivation shifts the burden of persuasion to the employer to demonstrate that an independent, lawful motive controlled its decision. The Board contends that the leafleting was the "motivating factor" in the Center's decision to fire Benin and suspend Vargas and that the disciplinary measures thus violated § 8(a)(1) of the Act. It asserts that the Center did not sustain its burden of persuasion to rebut the General Counsel's proof. · The Center counters that it did show an independent, lawful motive for the discipline—namely, the picketing—but that the Board's test imposed too high a standard of proof. We agree that shifting the burden of persuasion to the employer frustrates the balance between employer and employee rights struck in the Act.

A consensus among the courts of appeals has been reached with regard to the causation inquiry established in the Board's *Wright Line* test. The General Counsel must prove that the unlawful motive was the "but for" cause of the disciplinary measures. *E.g., NLRB v. Fixtures Mfg. Corp.,* 669 F.2d 547, 550 (8 Cir.1982); *NLRB v. Batchelder Co.,* 646 F.2d 33, 39 & n. 12 (2 Cir.1981); *NLRB v. Mount Desert Island Hospital,* 695 F.2d 634, 642 (1 Cir.1982); *NLRB v. Wright Line, A Division of Wright Line, Inc.,* 662 F.2d 899, 902–03 (1 Cir.1981), *cert. denied,* 455 U.S. 989 (1982). In addition, the reviewing courts have agreed that, after the General Counsel has presented a prima facia case, some type of burden should be imposed on the employer. To rebut the showing of unlawful motivation, it must introduce evidence of

was searched "thoroughly", but that description, even if exaggerated, hardly qualifies as a deliberate misstatement.

independent motivation for its decision. Since the employer presumably has greater access to information regarding its own motivations, shifting the burden to a certain degree after the General Counsel's showing of unlawful motivation is justified. However, the extent of that burden remains in dispute.

Although shifting the burden of persuasion has been sanctioned by four circuits, *Zurn Industries, Inc. v. NLRB,* 680 F.2d 683, 687 (9 Cir.1982); *NLRB v. Fixtures Mfg. Corp., supra,* 669 F.2d at 550 & n. 4; *Red Ball Motor Freight, Inc. v. NLRB,* 660 F.2d 626, 627–28 (5 Cir.1981), *cert. denied,* 456 U.S. 997 (1982); *NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442, 446 (6 Cir. 1981), three circuits have held that such a shift violates the requirement imposed upon the Board in § 10(c) of the Act, 29 U.S.C. § 160(c) (1976), that the General Counsel prove each unfair labor practice by a preponderance of the evidence. *NLRB v. Webb Ford, Inc.,* 689 F.2d 733, 739 (7 Cir. 1982); *Behring International, Inc. v. NLRB,* 675 F.2d 83, 87–91 (3 Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3199 (U.S. September 13, 1982) (No. 82–438); *NLRB v. Wright Line, A Division of Wright Line, Inc., supra,* 662 F.2d at 902–05. *See also NLRB v. Transportation Management Corp.,* 674 F.2d 130 (1 Cir.1982), *cert. granted,* —— U.S. —— (1982). Accordingly, the latter courts have held that the General Counsel's prima facie case shifts the burden of production, but not the burden of persuasion, to the employer to present some evidence that the discharge would have been effected irrespective of the discriminatory motive. We turn first to an examination of the propriety of the Board's burden shifting test.

At the outset of our analysis, we note that deciding the proper allocation of burdens is not within the Board's special competence "of applying the general provisions of the Act to the complexities of industrial life . . . and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of the particular cases.'" *Ford Motor Co. v. NLRB,* 441 U.S. 488, 496 (1979)

(citations omitted). Rather, the issue presented is a matter of statutory interpretation deserving greater scrutiny: "questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose specific duty it is to administer the questioned statute." *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31 (1944); *see also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 289 (1974); *NLRB v. Highland Park Manufacturing Co.,* 341 U.S. 322, 325–26 (1951). Especially when the contested interpretation implicates an explicit provision in the governing statute, we accord limited deference. Accordingly, we approach the issue with deference but with an eye fixed to the text and legislative purpose of § 10(c) of the Act.

We commence our scrutiny with an examination of the relevant part of § 10(c), which three courts of appeals have interpreted to require modifying the Board's allocation of burdens in discriminatory discharge cases:

"If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board should state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged . . . if such individual was suspended or discharged for cause."

The question, then, is whether the Board's test shifting the burden of persuasion to the employer violates that statutory mandate.

■ We believe, in accord with the First, Third, and Seventh circuits, that § 10(c) does not permit shifting the burden of persuasion. The plain language of the statute indicates that the General Counsel must prove by a preponderance of the evidence that the employer violated the Act. Indeed, the Board's own regulations specify

that the "Board's attorney has the burden of proof of violations of section 8 of the National Labor Relations Act." 29 C.F.R. § 101.10(b) (1982).[8] In the face of § 10(c)'s seemingly clear directive, the Board, backed by several courts of appeal, argues that shifting the burden does not affect the ultimate burden of proof. For further support, it relies on the legislative history behind enactment of § 10(c). We are persuaded by neither justification.

The Board's insistence that implementation of its test does not affect the ultimate burden of persuasion is simply unsupportable. Placing the burden of persuasion upon the employer to prove by a preponderance of the evidence that it had a lawful motive for the discharge does shift the ultimate burden. As Dean McCormick has explained, "the burden of persuasion is assigned only once—when it is time for a decision." McCormick, McCormick's Handbook of the Law of Evidence § 337, at 788 (2d ed. 1972). In other words, the ultimate burden of persuasion rests with the party that must convince the trier of fact at the end of a trial as to the outcome determinative issue—in this instance, the "real" motivation for the discipline. See 9 Wigmore, Evidence § 2485, at 283–87; § 2489, at 300–01 (Chadbourn rev. ed. 1981). Under the Board's *Wright Line* test, the General Counsel has to demonstrate only that the unlawful motive was a "motivating factor" in the discipline, not that the unlawful reason was the "but for" cause. If the unlawful "motivating factor" element is shown and the employer then fails to prove by a preponderance of the evidence that its independent lawful motive was the "but for" cause, then the Board would find that the employer violated the Act. As the Third Circuit stated in *Behring,* "[t]his would be so despite the fact that two factors—neither outweighing the other—had been advanced as causes, and the Board never determined which was the *real* one." 675 F.2d at 88 (emphasis added). Thus, the clear effect of the Board's rule is to change the ultimate burden of persuasion.[9] Pursuant to *Wright Line,* any case resting in equipoise would result in finding the employer guilty of an unfair labor practice, a result plainly at odds with the statute.[10]

---

**8.** In addition, § 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d) (1976), states that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."

**9.** The Board characterizes its burden shifting approach as imposition of an affirmative defense. *Wright Line, supra,* 251 N.L.R.B. at 1088 n. 11. To begin with, there is no question that an affirmative defense at least shifts the burden of persuasion on the particular issue—in this case whether the employer had a legitimate reason for reaching the decision to discipline the employees. An affirmative defense is usually reserved for those situations in which a defendant must prove a fact which bears no necessary relationship to an element of the charged offense. *See Mullaney v. Wilbur,* 421 U.S. 684, 706 (1975) (Rehnquist, J., concurring) (discussing permissible affirmative defenses in criminal context). For example, "necessity" or "self defense" is a common affirmative defense to a criminal charge. The defendant in those situations does not dispute the factual predicate to the charge; rather, he pleads extenuating circumstances to prove justification. But the burden shifts in this case on the issue of "causation" which lies at the heart of the § 8(a)(1) charge—was the unlawful motive a "but for" cause of the decision to discipline?

Thus, it is quite unpersuasive to claim that the burden is shifted on only the one issue and that the ultimate burden rests with the Board—there is no other issue in the case. *Cf. Stump v. Bennett,* 398 F.2d 111 (8 Cir.) (shifting the burden of persuasion to defendant to prove an alibi is unconstitutional since the alibi is a direct denial of participation in the criminal act, not a justification for admitted conduct), *cert. denied,* 393 U.S. 1001 (1968).

**10.** We recognize that a recent opinion of this Court indicated approval of the Board's *Wright Line* test, including the burden shifting formulation. *Consolidated Edison Co. v. Donovan,* 673 F.2d 61, 62–63 (2 Cir.1982). We applied the Board's test in the analogous context of the Energy Reorganization Act. However, the allocation of burdens evidently played no outcome determinative role in that case since the finding of discriminatory discharge would have been upheld under either variant of the "but for" test. *Id.* at 63–64. While shifting the burden of persuasion may be appropriate in Energy Act cases, the Energy Act has no counterpart to § 10(c) of the NLRA requiring proof by a preponderance of the evidence. *See* 42 U.S.C. § 5851 (Supp. III 1979). Thus, reliance on *Consolidated Edison* for establishing a precedent in this circuit is misplaced. *See also*

An examination of the legislative history indicates that our reading of § 10(c) is at least consistent with, if not dictated by, the extant legislative materials. In general, through § 10(c) and related provisions,[11] Congress sought to limit discretion exercised by the Board under the Wagner Act. *See, e.g.,* H.R.Rep. No. 245, 80th Cong., 1st Sess. 40–43, *reprinted in* 1 NLRB Legislative History of the Labor-Management Relations Act of 1947 (Legislative History) at 292, 331–34 (1948). In the discriminatory discharge context, the original House bill placed the burden squarely upon the General Counsel to prove that an employee was not discharged for cause: "No order of the Board shall require the reinstatement of any individual as an employee, or the payment to him of any back pay, unless the weight of the evidence shows that such individual was not suspended or discharged for cause." H.R. 3020, 80th Cong., 1st Sess. 39 (1947), *reprinted in* 1 Legislative History, at 31, 69. Members of the House apparently wished to prod the Board to articulate its reasons for reinstating an employee and thus ensure that meaningful appellate review would be possible. In too many cases, the Board had presented its conclusion of discriminatory discharge without analyzing why the illegitimate motive was the *real* reason for the discipline. H.R.Rep. No. 245, *supra,* at 42, *reprinted in* 1 Legislative History, at 333. The Senate amendments to the bill, however, omitted the "cause" provision. S. 1126, 80th Cong., 1st Sess. 28 (1947), *reprinted in* 1 Legislative History, at 99, 126. In reaching a compromise, the conference committee deleted the "weight of the evidence" language but inserted the cause provision, reformulating the standard in positive as opposed to negative terms. The committee report explained:

"The House bill also included, in section 10(c) of the amended act, a provision forbidding the Board to order reinstatement or back pay for any employee who had been suspended or discharged, unless the weight of evidence showed that the employee was not suspended or discharged for cause. The Senate amendment contained no corresponding provision. The conference agreement omits the 'weight of evidence' language, since the Board, under the general provisions of section 10, must act on a preponderance of evidence, and simply provides that no order of the Board shall require reinstatement or back pay for any individual who was suspended or discharged for cause. Thus employees who are discharged or suspended for interfering with other employees at work, whether or not in order to transact union business, or for engaging in activities, whether or not union activities, contrary to shop rules, or for Communist activities, or for other cause (see *Wyman-Gordon v. N.L.R.B.,* 153 Fed. (2) 480), will not be entitled to reinstatement. The effect of this provision is also discussed in connection with the discussion of section 7."

H.R.Rep. No. 510, 80th Cong., 1st Sess. 55 (1947), *reprinted in* 1 Legislative History, at 505, 559 U.S.Code Cong.Serv. 1947, p. 1161. The Board can find no solace in the above report. Indeed, the committee report reiterates that the *Board* must act on a preponderance of evidence and suggests that no substantive change was made from the earlier House draft which included the specific "weight of the evidence" language.

Despite the language in the committee report, the Board relies in particular on the

---

NLRB v. American Geri-Care, Inc., 697 F.2d 56, 64 (2 Cir.1982), *cert. denied,* —— U.S. —— (1983).

11. Congress amended § 10(e) to provide that Board orders are conclusive only if supported by "substantial evidence in the record as a whole." The fear was that the prior standard, "if supported by evidence" was in effect an abdication of appellate review. See H.Conf. Rep. No. 510, *supra,* at 55–56, *reprinted in* 1

Legislative History at 505, 559–60, U.S.Code Cong.Serv. 1947, p. 1135, 1162 ("[c]ourts will be under a duty to see that the Board ... does not infer facts that are not supported by evidence or that are not consistent with evidence in the record, and that it does not concentrate on one element of proof to the exclusion of others without adequate explanation of its reasons for disregarding and discrediting the evidence that is in conflict with its findings.").

colloquy in the Senate between Senator Pepper, a pro-labor opponent of the bill, and Senator Taft, one of the bill's architects, on whether to adopt the conference committee report. Senator Pepper expressed his fear that the new section, by placing the burden on the General Counsel, would emasculate the Act's protection against unlawful discharges. Senator Taft then attempted to placate him:

"Mr. PEPPER. Mr. President, turning to page 34 of the conference committee print, the conference has added the following language to the Senate bill . . . . [quoted above].

That looks like a very simple and innocent provision. It may seem on its face to be a very proper provision, for it appears only to give the employer the right to discharge a worker for good reason. But this is what the provision does: Under the present law a worker may be discharged by his employer for cause, but the Board may go into the real reasons for the discharge, and if the Board finds that although cause was given as the excuse, the real reason was the fact that the worker was trying to organize a union or trying to join a union, the Board may set aside the act of the employer and require the reinstatement of the worker upon that evidence. But this language allows a worker to be discharged because of union activities, although that may be only a concurrent cause of discharge. . . .

Mr. TAFT. I think the Senator is completely mistaken. That is not all the effect of this language. It merely states the present rule. If a man is discharged for cause, he cannot be reinstated. If he is discharged for union activity, he must be reinstated. In every case it is a question of fact for the Board to determine.

The House language provided that the burden of proof should be on the employee to show that he was not discharged for cause. The Senate conferees took the position that the question was whether he was discharged for cause, and that the burden of proving that cause should be on the employer, because the information is in his hands. So we did not accept the House provision. All this language does is simply to say exactly what the present rule is. If the Board finds that the man was discharged for cause, that is one possible outcome. If it finds that he was discharged for union activity, that is the other outcome. The Board must determine the facts in every case. For years it has had to determine in every case whether a man was discharged for cause or for union activity. In my opinion this language in no way changes the existing provision of law, after the modification which we forced in the House provision.

Mr. PEPPER. Let me comment on what the able Senator from Ohio has said. If it were not intended to change the existing law, why was anything placed in the conference report on the subject?

Mr. TAFT. Let me say why. When we have a conference with the House and the House yields on all the major points, if the House conferees want certain language in, and the language does not do any more than state the existing law, it is a little hard to refuse to put in it. For the purpose of the RECORD, I am glad to make that statement, because there is no intention whatever to change the existing law on this particular question. . . .

Mr. PEPPER. We have an admission from the Senator from Ohio that the language was intended to mean something. It was intended to shift the burden of proof from the employer to the employee.

Mr. TAFT. Mr. President, will the Senator yield?

Mr. PEPPER. I yield.

Mr. TAFT. Of course, the Senator understands that that part of the House language was taken out.

Mr. PEPPER. Yes. However, I wish to quote from the conference report, and I hope Senators will attend what I am about to quote. I suggest that the result of the conference report is to leave the interpretation of the language exactly as the House intended it. Let us see if that is correct. I read from page 55 of the conference report. . . . [quoted above].

That shows that the Senate conferees agreed to the elimination of the words 'weight of evidence', because they do not use those words which are necessary to accomplish the effect which the House sought to achieve. They say that under the rules of the Board itself the Board had to find by a preponderance of the evidence, and therefore there was not any need to put in the words of the House; but they do not disaffirm the purpose of the House, which the Senator from Ohio has acknowledged this afternoon....

Again, Mr. President, I remind the Senate that that is only one single provision of the bill, although many of them are iniquitous. It is a cumulative affair. Everywhere we turn there is a dagger or a nail or a spike to be stuck into the body of labor to make it less effective in the future than it has been in the past.

Mr. TAFT. Mr. President, will the Senator yield?

Mr. PEPPER. I yield to the Senator from Ohio.

Mr. TAFT. The conference report does not quite say what the Senator from Florida suggests. The original House provision was that no order of the Board could require the reinstatement of any individual or employee who had been suspended or discharged, unless the weight of the evidence showed that such individual was not suspended or discharged for cause. In other words, it was turned around so as to put the entire burden on the employee to show he was not discharged for cause. Under provision of the conference report, the employer has to make the proof. That is the present rule and the present practice of the Board. The Board will have to determine—and it always has—whether the discharge was for cause or for union activity, and the preponderance of the evidence will determine that question. The mere fact that there may be a little cause or real reason would not in any way lead the Board to refuse to give the employee reinstatement and back pay."

93 Cong.Rec. 6677–78 (1947), *reprinted in* 2 Legislative History, at 1565, 1593–95.

Although the debates are by no means conclusive, no clear intent to shift the ultimate burden of persuasion is manifest. Senator Taft's comment that "the employer has to make the proof" does not at all suggest that the burden of persuasion shifts; if anything, it may be understood to discuss something more akin to a burden of production. That reading is plausible in view of the Senator's next statement, "[t]he Board will have to determine—and it always has—whether the discharge was for cause or for union activity, and the preponderance of the evidence will determine that question." *Id.* at 6678, *reprinted in* 2 Legislative History, at 1565, 1595. Under Senator Taft's view, after the General Counsel's prima facie showing of unlawful motivation and the employer's countervailing demonstration of legitimate motive, the Board must determine the *real* reason by a preponderance of the evidence. This is exactly the reading which we impute to the Act.[12]

---

**12.** The statutory language therefore makes the Board's analogy to the Supreme Court's decision in *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274 (1977), unconvincing. In attempting to distinguish legitimate discharges from those tarnished by unconstitutional motive, the Court enunciated a burden shifting approach similar to that later adopted by the Board: "Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the [school] Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the [school] Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.* at 287. However, in *Mount Healthy,* the Court was not faced with any restriction comparable to § 10(c) of the NLRA, and therefore was free to allocate the burden of proof as it saw fit. *See Behring, supra,* 675 F.2d at 88. There may well be additional reasons for distinguishing the burden placed on an employee to prove unconstitutional motivation for his or her discharge from that placed on the Board in the §§ 8(a)(3) and 8(a)(1) contexts. *See also Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8 (1981) (In Title VII context, the Court

Thus, the legislative history does not so undermine the plain language of § 10(c) as to allow the Board to shift the burden of persuasion to the employer.[13]

The facts of this case clearly illustrate what we regard as the critical distinction between placing the burden of production upon the employer as opposed to the burden of persuasion. The unlawful motive in this case stemmed from the protected leafleting activity. In response to both leaflets, the Center took disciplinary action, suspending Benin and issuing a warning letter to Vargas. That discipline unquestionably violated § 8(a)(1) of the Act. But the Center's subsequent decision further to discipline the two employees came only after the picketing incident. To claim that the leafleting was still clearly the "but for" cause of the added discipline flies in the face of common sense. The leafleting may have contributed in part to the discipline; indeed the Center's letters to the employees notifying them of the discipline referred to both the leafleting and picketing. As the Board maintains, the Center might not have dis-

charged Benin solely for the picketing incident, especially since Vargas was only suspended for participating equally in the same activity. Yet these considerations do not suggest that the Center would have disciplined the employees a second time entirely because of conduct for which they had already been disciplined. The picketing must have played some role in the decision. The Board's test, however, allows the Board to reach the contrary result without analyzing the circumstances in full. The burden shifting approach of the Board might permit the two employees in question to escape any discipline for the picketing, even though other employees in the same situation may well have been lawfully disciplined.[14]

■ With competing motives present, the Board must decide which was the *real* or "but for" cause of the discipline. Before it concludes that an unfair labor practice was committed, it must be satisfied that the General Counsel has proven by a preponderance of the evidence that the unlawful motive engendered the disciplinary measure.[15]

emphasized that shifting the burden of production would "sharpen the inquiry into the elusive factual question of intentional discrimination," but that shifting the burden of persuasion would put the onus on the defendant to prove itself innocent).

13. Moreover, the Board has taken the legislative history of the 1947 Act completely out of its proper context. As Senator Pepper had remarked, the Taft-Hartley Act sought to limit, not expand, the protections that had been afforded employees in the Wagner Act. *See, e.g.,* H.R.Rep. No. 245, *supra,* at 4–5, *reprinted in* 1 Legislative History, at 242, 295–96. It would be anomalous to suggest that the 1947 Act afforded employees greater protection from unjust discharge than had the Wagner Act. In fact, the Supreme Court had rejected a constitutional challenge to the Wagner Act in part by construing its provisions to guarantee employers the right to discharge employees for any reason at all save conduct protected under the Act: "The Act does not interfere with the normal exercise of the right of the employer to select its employees or discharge them.... [T]he Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45–46 (1936). The Court sought to

ensure that union membership would not shield an employee from discharge as long as the *real* reason for the discharge was unconnected to union activities.

14. It seems evident that the Center would have disciplined the employees to some extent for taking part in the picketing, regardless of the previous leafleting. Although the Board will be unable to separate lawful from unlawful discipline in most mixed motive cases, it should allow some subsequent discipline to stand against the employees if the picketing is later found to be unprotected, even if the discharge of Benin and the suspension of Vargas are countermanded. Otherwise, the prior protected activities would have shielded the employees from lawful, appropriate discipline.

15. Sound policy reasons buttress our reading of § 10(c) of the Act. By forcing the Board to articulate why a preponderance of the evidence shows that the unlawful motive caused the discipline, the Board is likely to analyze the components of a discriminatory discharge more clearly and "not retreat behind the opaque language of 'burden of proof.'" *NLRB v. Transportation Management Corp., supra,* 674 F.2d at 134 (Breyer, J., concurring). Thus, one of the purposes behind enactment of §§ 10(c) and 10(e) of the Act is reached—encouraging rea-

We are not persuaded that, had the Board imposed a burden of production as opposed to a burden of persuasion on the employer, it would have arrived at the same result in this case. See *NLRB v. Mount Desert Island Hospital, supra,* 695 F.2d at 641–42. We make no judgment now on the lawfulness of the picketing should that determination become necessary on remand.

Accordingly, while we are prepared to enforce the Board's order in the respects indicated above, we remand the case to the Board for further proceedings pursuant to this opinion. We retain jurisdiction pending the Board's further order, any review of which shall be heard by the panel that heard the instant application.

Remanded.

soned elaboration from the Board, and simplifying the task of the reviewing court.