NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PRATT & WHITNEY AIR CRAFT DIVISION, UNITED TECHNOLOGIES
CORPORATION, Respondent.

INTERNATIONAL ASSOCIATION OF
MACHINIST AND AEROSPACE
WORKERS, AFL–CIO, DISTRICT 91,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

INTERNATIONAL ASSOCIATION OF
MACHINIST AND AEROSPACE
WORKERS, AFL–CIO, DISTRICT 91,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Technologies
Corporation, Intervenor.

Nos. 407, 430 and 431, Dockets
85–4106, 85–4116 and 85–4126.

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1985.

Decided April 25, 1986.

Victoria A. Higman, N.L.R.B., Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Linda Dreeben, Linda B. Weisel, N.L.R.B., Washington, D.C. of counsel), for N.L.R.B.

Edward J. Dempsey, Director—Indus. Relations & Labor Counsel, United Technologies Corp., Hartford, Connecticut, for Pratt & Whitney Aircraft Div., United Technologies Corp.

Gregg D. Adler, Hartford, Conn., (Kestell, Pogue & Gould, Hartford, Conn.), for Intern. Ass'n of Machinists and Aerospace Workers, AFL–CIO, Dist. 91.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

Our principal task on this petition is to review the voluminous administrative proceedings that passed on these claims of unfair labor practices arising from reopen-

er negotiations. Reopener clauses in collective bargaining agreements allow both parties an opportunity to modify their existing agreement in order to meet changing economic conditions. As such, they serve to minimize economic uncertainty at the time of bargaining. But, at the same time, as this case illustrates, the reopener has a potential to destabilize existing relationships by introducing an uncertainty of possible later conflicts concerning the practices pursued by the parties. Both parties to this appeal agreed to reopener negotiations. Yet, despite the fact that new contracts were signed, today, years after the fact, an employer and union are still litigating the claims of unfair labor practices that arose before and during the reopener negotiations.

The bargaining process engaged in by an employer and a union is not like a boxing contest where one side is declared "the winner." Rather, it is a relationship where the adversaries are locked together so tightly that every action by one causes an opposite reaction by the other—verifying Newton's law in the human arena. Hence, a necessary second task is to touch lightly on the judicial role in this process. It has been wisely observed that, subject only to duty to the community, labor combatants may struggle to the limits of their self-interest without courts setting boundaries for the contest. It is a legislative function to limit "individual and group rights of aggression and defense," and to substitute in place of the ancient trial by combat the "processes of justice." *Duplex Co. v. Deering*, 254 U.S. 443, 488, 41 S.Ct. 172, 184, 65 L.Ed. 349 (1921) (Brandeis, J., dissenting). Congress has set forth those processes in the statute that defines our powers of review.

## Background

Two National Labor Relations Board (NLRB or Board) decisions, *United Technologies*, 118 L.R.R.M. 1445 (February 28, 1985) and *United Technologies*, 118 L.R.R.M. 1556 (March 21, 1985), are consolidated in this appeal which encompasses three cases. In Case No. 4106 the NLRB seeks enforcement of its order finding that the employer, Pratt & Whitney Aircraft (Pratt & Whitney, Company or employer) violated § 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) (1982) by prohibiting the dissemination of scab literature and by placing constraints not permitted by statute on employee strike activity. The employer's failure to provide the union with the results of an employee survey was also found to constitute § 8(a)(1) and (a)(5) violations. In Case No. 4116, the International Association of Machinists (the Union) petitions for review from that part of the NLRB's decision holding that Pratt & Whitney had neither participated in direct dealing nor surface bargaining in violation of § 8(a)(1) and (5). In Case No. 4126 the Union further petitions for review of the Board's decision finding the employer not guilty of direct dealing during a second set of negotiations.

Thus, there are five issues raised in the three cases—(1) dissemination of Union literature, (2) constraints on employee strike activity, (3) employee survey results not provided to Union, (4) direct dealing, and (5) surface bargaining. For organizational purposes, we begin with the first two appeals that raise all five issues. These two appeals—Nos. 4106 and 4116—involve a common fact pattern arising from negotiations at Pratt & Whitney's East Hartford, Middletown, North Haven, Southington and Windsor Locks facilities in Connecticut. The third appeal—Case No. 4126—is based on negotiations at the company's Hamilton Standard plant which is also located in Connecticut.

## I SCOPE OF REVIEW

Because in portions of these cases there is a difference of opinion between the hearing officer and the Board, it is appropriate to discuss briefly the scope of review. Upon petition by the Board for enforcement of its order, this Court has jurisdiction over the entire proceeding. The scope of our review is long established. In 1913, the Supreme Court directed a court reviewing an Interstate Commerce Com-

mission order to examine the record with a view to determining whether there was "substantial evidence to support the order." *Int. Com. Comm. v. Louis. & Nash R.R.*, 227 U.S. 88, 98, 33 S.Ct. 185, 189, 57 L.Ed. 431 (1913). This standard of review is now mandated by statute in cases arising under the NLRA. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e)(1982). This standard was designed by Congress to broaden the reviewing court's scope of review and to require a closer examination of Board decisions. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The five issues raised in the appeals before us were all subject to a fact-finding hearing before an administrative law judge prior to consideration and determination by the Board. Thus, our review is governed on these petitions by the substantial evidence test.

■ Where the choice is between two conflicting views, even though the court might justifiably have reached a different conclusion if the case were before it *de novo*, the Board's decision may not be set aside. A Board determination may only be vacated when a reviewing court cannot conscientiously conclude—after looking at the record as a whole, including the evidence opposed to the Board's view—that the evidence supporting the Board's decision is substantial. *Id.* at 488, 71 S.Ct. at 464. The standard for review is not altered because the hearing officer and the Board, as here, disagree on some findings. But the evidence which the Board uses to support a conclusion "may be less substantial when an impartial, experienced examiner who has observed the witnesses ... has drawn conclusions different from the Board's than when he has reached the same conclusion." *Id.* at 496, 71 S.Ct. at 468.

It is familiar law that "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) (citations omitted). "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939) (citations omitted). "Congress was very deliberate in adopting this standard of review. It frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

Today, the standard by which a reviewing court applies the rule of substantial evidence to Board determinations is summarized in the shorthand formula that Congress has directed the courts to "assume more responsibility for the reasonableness and fairness of Labor Board decisions...." *Universal Camera*, 340 U.S. at 490, 71 S.Ct. at 465. With this precept in mind, we consider the three cases on appeal.

Cases Nos. 4106, 4116

II SCAB LITERATURE

A. *Background*

The employer and the Union through its four locals are parties to four existing collective bargaining agreements which were to run for five years.[1] Pursuant to these agreements, either party could reopen negotiations during a specified period for the limited purpose of changing the base hourly wage rate and cost-of-living allowance (COLA) for the final two years. If the new negotiations failed to produce modified agreements, then other aspects of the existing contracts, specifically the dues

---

1. The Locals had the following jurisdictions: (1) #700–Middletown plant; (2) #707–North Haven; (3) #1746–East Hartford; and (4) Lodge 1746A–Southington. All four are affiliates of IAM District #91.

check-off and no strike or lockout provisions, would become void. These agreements, executed on November 28, 1977, were by their terms effective until November 28, 1982. The reopener negotiations could occur only between mid-August and November 30, 1980.

The actions contested on these appeals were all taken before or during the reopener negotiations. As the reopener period approached, both sides sought to strengthen their respective positions. Since the Union was not operating under a union security clause, it attempted to increase its membership. As part of a membership drive, it distributed and posted literature through Local 1746A at the employer's Southington plant.

The first distribution occurred on February 26, 1980. The literature encouraged Union membership and referred to non-Union employees by such names as "scabs" and "freebies". The author Jack London's definition of "scab" was included, describing a scab as lower than a rattlesnake, toad and vampire. "The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer." *See National Association of Letter Carriers v. Austin*, 418 U.S. 264, 268, 94 S.Ct. 2770, 2773, 41 L.Ed.2d 745 (1974) (quoting London's piece in full). The local continued this pattern of derisive language when it republished on April 16 the London definition and informed employees it would publish a list of non-Union employees working at the Southington facility. One such list appeared on May 7; two more lists were later distributed on May 13 and May 20. The May 13 distribution used the scab language and further elaborated on the aid that non-Union employees gave the employer in the upcoming negotiations; it urged these employees "to get 'born again' —to ride the Union train and pay the Union fare." The second again referred to the non-Union workers as scabs.

The employer responded on May 30. It believed that such language violated the collective bargaining agreement's stricture that workers be free to choose whether or not to become Union members, and that it was contrary to an arbitrator's decision, at another plant, which prohibited the verbal use of such reviling language. As a result, the employer banned further distribution of this literature on its premises and threatened disciplinary action against any employee disregarding the prohibition.

### B. *Administrative Decisions*

The ALJ found that the leaflets were distributed as part of an organizational campaign and as such were protected activity under § 7, 29 U.S.C. § 157 (1982). He further held that the scab terminology did not take the publications outside that protection. Relying on *Austin*, and *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the ALJ concluded that the Union was entitled to disseminate such literature and that the employer's efforts to prohibit it violated § 8(a)(1). He noted that the employer had not shown any labor unrest directly attributable to the challenged language. The NLRB adopted these findings and upheld the ALJ's determination that the employer's conduct violated § 8(a)(1). *United Technologies Corporation*, 118 L.R.R.M. at 1557–58.

### C. *Discussion*

■ Consistent with the § 7 right to organize for the purpose of collective bargaining, workers can join, form, or assist labor unions and otherwise engage in group activity. 29 U.S.C. § 157. These rights extend not only to actions associated with collective bargaining, but also to actions directed at the workers' "mutual aid or protection." *Id.*

■ As part of their organizational efforts, unions may—subject to time, place and manner restrictions—communicate on an employer's premises with employees whom they currently represent. *NLRB v. Magnavox Co.*, 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974). Such communication facilitates the process of transforming single workers into a collective bargaining entity and ensures that workers have the information necessary to

make informed choices regarding their representational status and the positions to be taken on particular bargaining issues. Where, as here, a recognized union is engaged in a post-recognition membership drive aimed at non-union workers, its communicative actions—absent some statutory violation—are protected by § 7. *Austin*, 418 U.S. at 279, 94 S.Ct. at 2778. Thus, the distribution of these union leaflets or fliers is protected activity under § 7. *NLRB v. New York University Medical Center*, 702 F.2d 284, 289 (2d Cir.), *vacated on other grounds*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 73 (1983).

 Section 8(a)(1) prohibits employers from interfering with the exercise of § 7 rights, and an employer cannot, for example, arbitrarily issue a blanket rule forbidding distribution. Although distribution and posting of union literature may not be prevented during non-working time in non-working areas, such a restriction is enforceable when special circumstances are shown. Such special circumstances exist when the leaflet is on its face inflammatory or potentially inflammatory. "[T]he critical question is not merely whether the leaflets are provocative, but whether the provocation could be expected to threaten plant discipline."[2] *New York University Medical Center*, 702 F.2d at 290. Special circumstances must be proved by the employer. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803–04 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945). In evaluating such a claim, deference is granted to the Board's findings.

 Language in union distributions can threaten plant discipline in two possible ways. First, the words chosen could themselves be so offensive on their face as to create a reasonable expectation that plant discipline will be disrupted. *New York University Medical Center*, 702 F.2d at 290. Neither the use of the scab terminolo-

gy nor the London definition fall in this *per se* category. The Supreme Court has noted, that "the Board has concluded that epithets such as 'scab,' 'unfair,' and 'liar' are commonplace in these struggles and not so indefensible as to remove them from the protection of § 7 ...." *Linn*, 383 U.S. at 60–61, 86 S.Ct. at 661–62. Second, the language can be sufficiently provocative so that in the context of the particular negotiations, plant peace is threatened, and § 7 rights are outweighed by these concerns of plant discipline. Pratt & Whitney failed to show that this was the case here. No example of actual unrest can be pointed to, nor was the language shown to implicate safety concerns. *See New York University Medical Center*, 702 F.2d at 289–91; *cf. Southwestern Bell Telephone Co.*, 200 NLRB 667, 670–71 (1972) (employees wore T-shirts adorned with anti-employer language perceived as threat to plant discipline); *Proctor & Gamble Mfg. Co.*, 160 NLRB 334, 391–95 (1966) (actual fight between two employees). Since the scab terminology has been previously accepted, and there is no proof demonstrating labor unrest, we accept the Board's findings that the employer violated § 8(a)(1) by prohibiting the distribution and posting of the scab literature.

## III THE SURVEY

### A. Background

During the period from April 1 to August 1, 1980, the employer conducted interviews and surveyed employees at all four plants who were hired after November 1977. Pratt & Whitney conducted the survey to determine employees' attitudes regarding the workplace and to evaluate employees' knowledge of and attitudes toward various benefit programs provided by the employer. *United Technologies*, 118 L.R. R.M. at 1559. The survey asked the em-

---

**2.** One exception to this would be in a case where statements made by the Union both were defamatory and known to be false when stated. In *Linn*, 383 U.S. at 61, 86 S.Ct. at 662, the Court made clear that these statements are not protected under § 7.

In this case, the use of the word "scab" was not false and thus not libelous since the language was in fact directed at employees who were non-union members. *See Austin*, 418 U.S. at 283, 94 S.Ct. at 2780. Additionally, no defamation claim was ever asserted in this case.

ployees to rate their various health, vacation, and bonus benefits on a scale of poor to excellent. Additional questions probed whether the employees were satisfied with their remuneration and examined whether there was general knowledge concerning the calculation of retirement benefits. Employee views and suggestions on any aspect of the company's performance were also solicited. Three of the interviews included brief discussions of the issues to be raised in the upcoming reopener negotiations. Employee participation was voluntary and all responses were to be confidential. From the survey responses, a report was subsequently prepared that enabled Pratt & Whitney to ascertain employee opinions regarding the employer's wage structure, fringe benefits and physical working conditions.

The Union was first made aware of the survey during early July by employees and shop stewards at the North Haven plant. That plant's personnel manager informed the president of Local 707 that the "interviews were being conducted by a guidance counselor from one of the local high schools and that they were directed toward improving the preparation of the students from that school for employment at [Pratt & Whitney]." When asked whether the questions addressed contractual benefits, the manager responded that the survey "related to the employees' knowledge of the benefits that they received and the conditions under which they worked." The Local President's request to participate in administering the survey was turned down, as was his request for its results.

### B. *Administrative Decisions*

The ALJ found that the survey, undertaken by the employer without notifying the Union, constituted direct dealing in violation of § 8(a)(1) and (5). Relying on *Obie Pacific Inc.*, 196 NLRB 458, 460 (1972), the ALJ held that though an employer may communicate with its employees, it cannot use a survey for the purpose of ascertaining employee sentiment and undermining the Union just before a negotiating session, when such knowledge could be used to gauge the strength of employee support for various provisions of the union bargaining position. He noted that additional factors, specifically the "failure to notify the Union of its intention to take this survey, its refusal to permit the Union to either sit in on the interviews or see a copy of the questions being asked, and its refusal to furnish the Union with a copy of the results of that survey constituted additional aspects of . . . [the employer's] refusal to bargain in good faith with the Union."

The Board reversed the ALJ's determination that the employer's conduct *in taking the survey* amounted to an unfair labor practice. *United Technologies*, 118 L.R.R.M. at 1559–60. The Board distinguished *Obie Pacific*, and other similar cases observing that the violations in those cases were all based on employer attempts to circumvent the union by soliciting information directly relevant to ongoing negotiations or current union positions. In contrast, the Board found that the survey's questions "solicited employee sentiment with respect to contractual benefits which were clearly outside the scope of the upcoming reopener negotiations." *Id.* at 1559. It noted that the questions were not designed to increase the employer's knowledge of the employees' positions; rather, they were intended to ascertain how well the employer was communicating its position to the employees. Unlike *Obie Pacific*, the employer did not hold itself out as the employees' friend, ready to correct employee complaints voiced in the survey, and impliedly indicating the Union's comparative inability to produce results. Given these findings, the Board concluded that there was no labor violation implicated in taking such a survey.

The Board nonetheless affirmed that part of the ALJ's decision which found that the failure to provide the Union with the *survey results* violated § 8(a)(1) and (5). Although the information sought was not directly relevant to the reopener negotiations, it did relate to wages and other terms of employment. Such information must be provided to the Union when re-

quested because it is presumptively relevant to general collective bargaining, though an employer may rebut this presumption by showing that the requested information is not relevant. Here the company did not meet that burden simply by denying the Union's request without explanation, or by later stating that the survey information is irrelevant because it relates only to employees with limited seniority.

## C. *Discussion*

The issue is whether the refusal to supply the survey results constituted an unfair labor practice under § 8(a)(1) and (5). An employer has an obligation to provide a union with all information necessary for the proper performance of its duties as the exclusive bargaining representative. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *Prudential Insurance Company of America v. NLRB,* 412 F.2d 77, 81 (2d Cir.), *cert. denied,* 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969). This obligation extends not only to information relevant to the negotiation of a new collective bargaining agreement, but also encompasses information relevant to the supervision of an existing agreement. *See Acme,* 385 U.S. at 436, 87 S.Ct. at 568; *Prudential,* 412 F.2d at 81. Refusal to provide such information is a failure to bargain in good faith. *See Acme,* 385 U.S. at 435, 87 S.Ct. at 567; *NLRB v. Leonard B. Hebert, Jr. & Co.,* 696 F.2d 1120, 1124 (5th Cir.), *cert. denied,* 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983).

Wage and other benefit material pertaining to bargaining unit employees must be produced by an employer as it is presumptively relevant to the union's duties as exclusive bargaining agent. *Grand Islander Health Care Center,* 256 NLRB 1255, 1256 (1981); *Western Massachusetts Electric Company,* 234 NLRB 118, 118–19 (1978). Consequently, the facts gleaned by the survey—admittedly relating to wages and fringe benefits—are pertinent to the union's role as representative both for the existing contract and for the new contract being negotiated pursuant to the reopener clauses.

▮▮▮▮ The employer argues that the Board's initial finding—that the taking of the survey did not constitute direct dealing because the subjects inquired into were not subjects of bargaining under the reopener clause—logically leads to the conclusion that the survey results were not material to the upcoming negotiations. To the contrary, the first finding does not compel the second. Although the questions related to issues outside the scope of the reopener negotiations, they addressed areas important to the Union's role in supervising the existing agreement and could have played a role in any Union decision regarding whether to accept a three-year as opposed to a two-year offer. Further, Pratt & Whitney's argument is procedurally barred as it did not present this argument to the Board. 29 U.S.C. § 160(c) (1982).

▮▮▮▮ The employer also asserts that it cannot reveal the survey results because it told the employees that the responses would be confidential. Unquestionably, there are instances when the harm to employees that might result from disclosure are significant enough to affect the union's right to obtain the information. In *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 312–17, 99 S.Ct. 1123, 1130–32, 59 L.Ed.2d 333 (1979), the Supreme Court held that an employer did not have to turn test questions over to the union where such dissemination would ruin the test's value because future takers would already know the questions. The Court explained that these tests were critical in determining who would be the best suited for a particular company position.

▮▮▮▮ The confidential concerns in this case do not rise to the same level as those recognized in *Detroit Edison,* 440 U.S. at 317–20, 99 S.Ct. at 1132–33, which involved the potential for harassment and embarrassment associated with psychological testing. A mere promise of confidentiality is not a defense to furnishing the results, though the reason for making such promise

may provide a defense. But here the employer cannot identify any substantial reason why the information should remain confidential. Many employers are interested in learning how effectively their benefit packages are communicated to employees and whether their employees are satisfied. Simply asserting that the results should remain confidential because the employees were promised confidentiality does not discharge the employer's burden. Hence, the refusal to disclose the survey results was properly found to violate § 8(a)(1) and (5). We therefore agree with the Board's conclusion and order.

## IV FOREMAN STRONCEK'S REMARKS

### A. *Background*

We turn now to events which occurred during the actual reopener negotiations. We begin with the actions of one individual during these negotiations—Foreman Stroncek. The allegations arising from the entire pattern of bargaining will be discussed later.

On November 26, 1980 as the reopener negotiations stalled and a strike appeared more likely, Stroncek called a meeting of the employees in his department at the East Hartford Plant to answer questions regarding the possibility of a strike and the workers' rights if a strike should occur. He told the employees that they would have to call in every day that they missed work and provide a reason for their absence. Failure to follow these procedures would warrant dismissal. The shop steward was absent at the time of the meeting and his efforts to have a new meeting scheduled in order to advise employees that they did not have to call in daily were rebuffed. On the same day, Pratt & Whitney published a special edition of its plant newsletter answering a number of questions concerning the workers' rights and responsibilities during a strike. Workers were informed that they had the right to strike, that they could resign from the Union before a strike, that as economic strikers they could be reinstated after the strike's termination, and that no strike at Pratt & Whitney had resulted in increased benefits to strikers.

### B. *Administrative Decisions*

The ALJ held that the call-in requirement would interfere with and impede the worker's right to strike. Since an employer is prohibited under § 8(a)(1) from interfering with workers' protected rights, the foreman's actions constituted an unfair labor practice. The Board upheld this result, though it relied on different testimony to support the factual findings. *United Technologies*, 118 L.R.R.M. at 1557–58 & n. 4.

### C. *Discussion*

 Section 8(a)(1) prohibits an employer from interfering with employees' § 7 rights. One of which—derived both from § 7 and specifically authorized by § 13—is the right to strike. 29 U.S.C. § 163. Thus, employer actions which interfere with or attempt to discourage the exercise of the right to strike—by threatening employees with sanctions or penalties or imposing impermissible obligations on striking workers—are unfair labor practices within the meaning of § 8(a)(1). *See, e.g., NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 235–36, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). Workers are not required to call in each day of a strike, nor are they required to provide reasons for their absence. Even though no strike took place in this case, advising the East Haven employees that a "call-in" was required interfered with their right to strike. Moreover, threatening discharge for failing to obey these edicts might have discouraged some employees from striking. Therefore, Foreman Stroncek's remarks as a representative of the employer violated § 8(a)(1).

## V THE DIRECT DEALING AND SURFACE BARGAINING CHARGES

### A. *Background*

We now turn to the Union's allegations that the company's conduct throughout the reopener negotiations reveals a policy of

direct dealing and a refusal to bargain in good faith. Several months preceding the actual negotiations the Union undertook two actions. It requested the company to supply data concerning wages, hours, and other conditions of employment, and it began a campaign to inform the workers of the Union's position and to compare the employer's wage and benefit package with those offered by major aerospace firms throughout the country. At this time Local 1746 was also engaged in its membership campaign and was distributing the challenged scab literature. This provoked preliminary skirmishing over furnishing the data, comparing nationwide aircraft rather than eastern aircraft engine manufacturers, and discussing informal reopener sessions without the full Union bargaining committee.

On November 1 the company made its first direct communication to its employees. Replying to the many prior Union mailings, it sent every bargaining unit employee a letter that compared the company's wage and benefit package with those of major East Coast engine manufacturers and chided the Union for its comparisons to West Coast aircraft manufacturers. Further, employees were told that the Union's advance publicity was putting the parties on a "collision course", and that only through "common sense" and "good faith negotiations" could this pre-Christmas collision be avoided. The letter concluded by asking each employee to read the benefit comparisons and draw his own conclusions.

Six bargaining sessions ensued between the employer and the Union. The first was held on November 3. The Union's initial proposals were rejected by the employer as "pie in the sky;" the company made no counter-offer. Starting on November 4 and concluding on November 10, the Union sent six fliers to the employees describing the first bargaining session and providing strike-related information. The second negotiating session held on November 11 produced no change. On that day the employer communicated directly with the employees for the second time. It distributed a bulletin, which it had shown the Union, attacking the Union's high initial demands, and characterizing them as "thoughtless and irresponsible." The third meeting occurred on November 14 without changing the status quo. No offer was made by the company. The Union inquired as to whether an offer was being made to the Teamsters at the company's Sikorsky plant and, if so, objected to using such a small plant as a potential trendsetter for all of Pratt & Whitney's labor negotiations. The Union also demanded that any offer made at Sikorsky also be made to it.

The company announced on November 16 that the Sikorsky workers had accepted a new three-year contract outside the scope of their contract's reopener terms. The next day the company distributed a bulletin to its supervisory personnel, which was available to all employees. Various aspects of the Sikorsky agreement were discussed and the benefits resulting from not limiting negotiations to the terms of the reopener were presented. The Union responded defending its decision to avoid Sikorsky-like negotiations, including early reopener bargaining on a wide range of issues and "private meetings" with the employees. The fourth bargaining session took place on November 18. Again, the employer refused to make an offer, but stated that when it made an offer it would be similar to the Sikorsky three-year offer. The Union replied that it would not accept any contract whose terms extended beyond the reopener's scope. The day immediately following this meeting the company communicated a third time with the employees in a bulletin addressed to supervisors, but again seen by all employees. It discussed the Sikorsky agreement and described the Union's recalcitrance as "unrealistic".

Mediators were finally called in and both parties had separate meetings with them on November 20 and 24. A revised Union offer was presented and a decision reached for both parties to begin direct bargaining later on the 24th. At this meeting the employer made its first offer for a new three-year comprehensive collective bargaining agreement, practically identical to

that accepted by the Teamsters at Sikorsky. The proposal provided for a wide range of benefits and a new savings plan was introduced to replace the Christmas bonuses that the company hoped to eliminate. Consistent with its prior aversion to the Sikorsky contract, the Union rejected this offer, stating that it was only interested in an agreement structured within the terms of the reopener provisions. On November 25 both parties again met individually with the mediator.

The parties met for a fifth negotiating session on November 26. The company presented a two-year wage and COLA proposal which included a wage increase and a 30 percent capped COLA. In comparison to the Union's latest proposal which would have increased labor costs by 45 percent, the employer's proposal would have raised its costs by 20.3 percent. The Union deferred comment on the proposal pending further study. The final meeting took place on November 29. The company's improved offer—a two-year wage increase with quarterly capped COLA adjustments amounting to a 23.3 percent increase in labor costs—was orally presented. The savings plan was included and the Christmas bonus dropped, though the company recognized that the plan was outside the reopener's scope. Union requests to modify the offer by transferring the savings plan costs to the COLA were refused and the Union stated that it would recommend rejection of the offer. The company made its offer public before the Union received the official written version. On November 30, two full page advertisements were placed in area newspapers; one describing the employer's offer, the other reprinting an earlier editorial concerning a possible strike.

The ratification meeting took place on November 30. Although a majority of the employees rejected the company's offer, the rejection was by less than a two-thirds vote. Under the Union's International Constitution a strike is only permitted upon a two-thirds vote rejecting an offer, and it further provides that if a strike is not authorized, the offer is automatically ac-

cepted. Consequently, Pratt & Whitney's offer was accepted.

### B. *Administrative Decisions*

The ALJ concluded that the employer's refusal to provide the requested wage and hour information was not an unfair labor practice. Nonetheless, he held that the employer engaged in surface bargaining and in direct dealing through its combination of bargaining tactics and communications with the employees. All except two of the ALJ's conclusions were accepted by the NLRB. The Board rejected the findings that the employer participated in direct dealing and surface bargaining. The Board looked at the totality of the bargaining relationship to find two parties involved in "very hard and intense bargaining." *United Technologies*, 118 L.R.R.M. at 1561. It believed that the Union started the ball rolling by disseminating literature months before the beginning of the reopener negotiations. Throughout the negotiations, the Union informed the employees of their strike options and otherwise "engaged in a fair degree of saber rattling." *Id.* at 1561–62. Much of this occurred before the employer's position was even known. The employer, which has a right under § 8(c) to communicate with its employees, could therefore legitimately criticize the Union's tactics and disseminate its views. The Board noted that: "[i]n no instance did the [company's] material contain proposals or ideas which were not first submitted to the Union at the bargaining table." *Id.* at 1562. Since free discussion ultimately benefits the workers, employers should be encouraged to exercise their § 8(c) rights, absent explicit or implicit attempts to have the employees abandon the union. As there were no such attempts, there was no direct dealing.

The Board also rejected the ALJ's finding of surface bargaining. It first noted that the ALJ based his opinion on "the ... [employer's] conducting of the wage survey, its communications with employees which the [ALJ] found constituted direct dealing, its conditioning of its offer of early

negotiations on the Unions's [sic] being willing to meet outside the presence of its full bargaining committee, its delay in submitting counterproposals, the inclusion of a savings plan in its counterproposals, and its prohibiting the employees' distribution of prounion anti-scab literature." *Id.* These factors no longer were valid because the Board reversed the ALJ's finding that the taking of the survey violated § 8(a)(5) and his finding of direct dealing. Similarly, the employer's refusal to make any offer until late in the reopener negotiations had already been upheld and therefore added little. Conditioning early meetings on the absence of the full bargaining committee was not bargaining to impasse, nor was it suggested to be a separate unfair labor practice. The remaining possible factors for finding surface bargaining—the company's unlawful ban on the employees' dissemination of the antiscab pamphlets and its refusal to provide wage survey information, provided an inadequate basis to support a finding of surface bargaining. *Id.* Therefore, the Board dismissed the surface bargaining finding. In the discussion that follows we analyze both direct dealing and surface bargaining.

## C. *Discussion*

### 1. Direct Dealing by Employer

When workers have determined who their bargaining representative will be, an employer must bargain in good faith only with that representative. *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944). The employer must "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement...." 29 U.S.C. § 158(d). A reciprocal duty is placed on the union.

Labor negotiations do not occur in a vacuum. While the actual bargaining is between employer and union, the employees are naturally interested parties. During a labor dispute the employees are like voters whom both sides seek to persuade. As discussed earlier, unions are granted extensive powers to communicate with employ-ees in the represented unit. Consistent with the First Amendment, the employer must also be afforded an opportunity to communicate its positions. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). This First Amendment right is embodied in § 8(c), which allows the employer to express "any views, argument, or opinion" in any media form without committing an unfair labor practice provided that "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c); *Gissel*, 395 U.S. at 617, 89 S.Ct. at 1941.

 Granting an employer the opportunity to communicate with its employees does more than affirm its right to freedom of speech; it also aids the workers by allowing them to make informed decisions while also permitting them a reasoned critique of their unions' performance. *NLRB v. General Electric Co.*, 418 F.2d 736, 764 (2d Cir.1969) (Waterman J., concurring), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). Yet, an employer's right to communicate with its employees is not unlimited. Attempts to coerce the employees, or to portray the employer rather than the union as the workers' true protector, remove such speech from the penumbra of protection and may constitute an unfair labor practice. *Adolph Coors Company*, 235 NLRB 271, 277 (1978). The fundamental inquiry in a direct dealing case is whether the employer has chosen "to deal with the Union through the employees, rather than with the employees through the Union." *General Electric*, 418 F.2d at 759. Efforts to bypass the Union are considered direct dealing prohibited by § 8(a)(5). Moreover, such acts circumvent the workers' § 7 right to select a representative and bargain collectively. *Texas Electric Corp., Inc.*, 197 NLRB 10, 14 (1972).

 Direct dealing is identifiable in two ways: the employer's communications themselves can provide a basis for finding an unfair labor practice; additionally, the challenged communications can be viewed

within a pattern of other unfair labor practices which, when examined in its totality, reveal direct dealing in violation of § 8(a)(5). *Adolph Coors Co.*, 235 NLRB at 277. We examine the facts in light of these two possibilities.

None of the employer's communications to its employees were coercive. While strong language was used, stating that the union was on "a collision course," that their preparation was "thoughtless and irresponsible," and that their offers were "unrealistic," the employer never directly said—nor even implied—that the workers would be better off without the Union. Further, each substantive proposal brought to the workers' attention was first presented to the Union at the bargaining table. The communications recognized the Union as the legitimate bargaining representative, acknowledged that there were only a limited number of mandatory bargaining subjects under the reopener provisions, and urged the workers to act through Union channels or at the ratification meeting. In advising the workers of their rights and obligations during a strike—except for Stroncek's remarks—no undue burdens were placed on the employees, nor were there any threats if a strike ensued. The Union concedes that the communications themselves did not constitute an unfair labor practice since it argues that the communications were direct dealing only when viewed in the context of the entire negotiations, with particular emphasis on what the Union characterizes as surface bargaining.

We cannot agree. Examples of cases finding direct dealing illuminate our disagreement. In *General Electric Co.*, the employer combined a single take-it-or-leave-it offer with an extensive publicity campaign aimed at its employees. The campaign's purpose was to counter what the company recognized as the employees' perception, derived from prior labor disputes, that compromise positions actually adopted were only adopted because of the strength of the union rather than the fairness of the employer. 418 F.2d at 740–41. Additionally, the employer improperly took unilateral action on an insurance issue and refused to furnish legitimately requested information. Particular aspects of the employer's bargaining strategy such as repeatedly taking "unreasonable" positions on minor issues solely for the purpose of avoiding settlement were also criticized. *Id.* at 757–58.

■■■■ Certain principles may be discerned from decisional law. Statements threatening employees' § 7 rights or suggesting they abandon the union implicate § 8(a)(5). Comments innocuous in themselves may—when coupled with a refusal to bargain or surface bargaining at the negotiating table—constitute direct dealing. Employers' messages to employees that exalt its proposals or criticize the union do not rise to the level of an unfair labor practice unless the language is strong or other unfair labor practices are found. Compare *Texas Electric Corp.*, 197 NLRB at 12–14 (anti-union employer speech plus aid in revoking union certification exalted the employer at the union's expense and constituted direct dealing) with *Endo Laboratories, Inc.*, 239 NLRB 1074, 1084 (1978) (non-coercive substantially truthful comments accompanied by public proposals first submitted to the union do not constitute direct dealing since the possibility of circumventing the union is remote). Thus, determining whether direct dealing has taken place is a complex task involving a balancing of the rights of the workers, the union, and the employer. In that balancing process, the employer's right to present its position so that employees may hear both sides should not be downplayed.

■■■■ In light of the relevant law, the employer's communications here did not amount to direct dealing. The information was first given to the Union; the language was non-coercive; and the Union was consistently acknowledged as the legitimate bargaining representative. None of the three instances of misrepresentation are outcome-determinative: (1) The failure to tell the workers that the savings plan was replacing Christmas bonuses is harmless because it is non-coercive, so there is no

violation of § 7 rights. Moreover, the savings plan was more costly for the employer than the Christmas bonuses. Hence the workers' benefits were not reduced. (2) Advising the employees via a newspaper advertisement that they could continue to work during extended negotiations was also non-coercive and did not diminish the Union's status. (3) Foreman Stroncek's comments, though admittedly coercive with regard to employees' § 7 rights, did not purport to coerce the employees to abandon the Union or accept the employer's offer. Further, the Union had information readily available to show that each of the statements was false, and therefore it could easily have rebutted them. Moreover, for the reasons discussed below there was no surface bargaining. Finally, none of the existing independent unfair labor violations found here—the refusal to provide survey information, the ban on the distribution of scab literature, and Foreman Stroncek's comments—implicate § 8(a)(5). None so limited the Union's bargaining power, or coerced the workers to abandon the Union in favor of the employer as to support a finding of direct dealing.[3]

## 2. Surface Bargaining

 The Board also found that Pratt & Whitney did not engage in surface bargaining. Surface bargaining is characterized by an employer's refusal, in violation of § 8(a)(5), to participate in meaningful, good-faith bargaining with its employees' chosen representative. *The General Athletic Products Co.,* 227 NLRB 1565, 1574 (1977). When an employer chooses one opening position and thereafter refuses to bargain, or creates non-issues simply for the purpose of forestalling agreement, it is engaging in surface bargaining, because it

implies that the company can successfully circumvent the union. *See General Electric,* 418 F.2d at 763.

 The employer's challenged actions do not point to bad faith. Significantly, the employer did not adopt one bargaining position. Although a party is not obligated to deviate from an established bargaining position, a rigid single offer coupled with a specific refusal to consider alternative positions suggests surface bargaining. *General Athletic Products Co.,* 227 NLRB at 1574. Pratt & Whitney opened negotiations with a three-year offer, which though not a mandatory subject of bargaining, was legitimately presented provided the employer did not insist upon their inclusion. *NLRB v. Borg Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). It properly did not bargain to impasse, but instead later formulated a two-year offer whose terms were within the reopener's scope. This two-year offer was also modified in an attempt to reach agreement. Certainly such efforts constitute meaningful bargaining.

Additionally, as discussed previously, there was no direct dealing. In communicating through the media the proper role of the Union was not overlooked. Having concluded that there was actual bargaining, substantial evidence supports the Board's conclusion that the employer was not guilty of bad faith bargaining when the record as a whole, including the independent unfair labor practices that were found, is considered.

Case No. 85–4126

## VI THE HAMILTON STANDARD NEGOTIATIONS

### A. *Facts*

Local 743 represented employees at the Hamilton Standard Plant. Both parties

---

**3.** Both the Board and ALJ found that the timing of the employer's offer was not in itself an unfair labor practice. This issue is not before us and we therefore accept the Board's determination. We add here only that an offer's timing may be evidence pointing either to direct dealing or surface bargaining. When a *pro forma* offer is made—one where a company presents an incomplete offer to the union and having shown it to the union first, then quickly makes

it available to the employees—direct dealing concerns may be implicated. In such a case the real objective is to circumvent the union and make the offer to the employees directly by first making the union an offer known to be unacceptable. In Cases No. 4106 and 4116 timing does not implicate direct dealing concerns. Although the offers were made orally, the Union was made aware of the Sikorsky contract and told that it would receive a similar offer.

were governed by a collective bargaining agreement identical to the one previously discussed, except its effective dates were from April 1977 to April 1982. The beginning of reopener negotiations was set for April 1980. The Hamilton Standard contract had always been negotiated after the East Hartford contract and has followed that contract's language.

The first reopener meeting occurred on April 6, followed by one on April 9. The third meeting was held on April 13, at which the employer made its first offer—a two-year offer. Both sides modified their wage positions on April 20, but nonetheless rejected each others' offers. A final meeting was held on April 23, just prior to the Union's scheduled ratification meeting set for the 26th. The Union again modified its proposal and the company responded with a final offer, which actually contained two alternatives. The first was consistent with the reopener, but the second was a completely new three-year offer that was "substantially similar" to the offer rejected at the East Hartford facility. The Union rejected the three-year proposal.

On April 23 the company distributed leaflets similar to those used in the prior reopener negotiations. The leaflets presented both of the employer's offers, advocated the three-year offer, recognized that the Union was not bound to discuss its terms, and asked that the employees consider both positions and attend the ratification meeting. While distributing these leaflets, company supervisors made certain challenged statements. One supervisor described the employer's two-year proposal as "substandard," read the entire three-year offer and told the employees that if they wanted the three-year package, they ought to "get over to the Union and let the people know what they wanted...." *United Technologies*, 118 L.R.R.M. at 1446. At another gathering, two company officials endorsed the three-year plan, urged the employees to petition the Union to consider it, and told

them that the company was bringing it to their attention because the Union was unwilling to consider it. *Id.* A second communication was made to the employees on April 24. In a letter, Pratt & Whitney again touted its three-year proposal stating the reasons why both the company and the employees should favor it. Additionally, the company expressed a willingness to modify the three-year offer provided that the total cost remained within the company's ceiling and told the employees that such was the course that future negotiations would take.

The ratification meeting took place as scheduled. Only the two-year offer was discussed, and it was rejected by the employees. The Union failed again to garner enough votes for a strike and the offer was therefore accepted.

### B. *Administrative Determinations*

The ALJ found direct dealing. He recognized that the employer was entitled to make the three-year offer, but held that it could not publicize its contents because of the offer's timing.[4] The NLRB reversed. First, it noted that since the employer had a right to make the offer, the only issue was whether its publication was direct dealing. The offer was first made to the Union, there was no coercive language nor any attempt to have the employees abandon the Union, and there was no surface bargaining, all factors which the Board found weighed against a finding of direct dealing. The offer's timing was not discussed, other than noting that it first was made available to the Union. The various remarks by company officials were found protected under § 8(c) because they were non-coercive and the "substandard" comment was directed at one of the company's proposals, not at the Union's demands. *Id.* at 1447–48 n. 7.

### C. *Discussion*

■ As the Board observed, the employer had the *right—regardless of Union*

---

**4.** "[I]t seems to me that given the nature and timing of the three year offer, it was made, not

with any genuine expectation that the Union would, or even could seriously consider it.

sentiment—to propose the three-year contract. Moreover, it could also legitimately determine when it would make such an offer. Once that offer was made, the employer was then free to inform the employees of its contents and to advocate its acceptance. It is only prevented from making an offer directly to employees when it fails to make a prior showing to the Union, subject to the caveat that in making its presentation it cannot hold itself to be the employees real benefactor, thereby leading employees to leave the Union.

The employer acted within these bounds. The offer was made first to the Union and then presented to the employees in factually correct, non-coercive language. The Union's role in the process was recognized as was the Union's right not to bargain on the three-year offer. Employees were told to inform the Union of their position and to vote at the Union ratification meeting. While some of the managers' remarks might indicate employer expressions that the Union was standing in the way of an agreement that would be better for both the workers and the company, these statements are not as blatant as those made in *Texas Electric Corp.*, 197 NLRB at 10, nor were there subsequent employer unfair labor practices.

The Union claim of surprise is irrelevant since the employer's actions were legal. Further, that claim is somewhat disingenuous because the Union had seen a similar offer a few months earlier. Local 700 had representatives at the previous reopener negotiations and the Union itself had accepted a similar offer at Pratt & Whitney's Government Products Division. The Hamilton Standard contract was tied historically to the East Hartford contract, so it appears reasonable to anticipate that the employer would adopt a similar bargaining stance. Moreover, when the Union first stated that it was opposed to a three-year contract, the employer specifically reserved the right to make such an offer.

The lack of surface bargaining also supports our conclusion. Neither the ALJ nor the Board found that the employer negotiated in bad faith. The company made an offer within the reopener's scope and modified it in an attempt to reach agreement. It made a three-year proposal, offered to modify it, and did not bargain to impasse. The employer's activities are in no way comparable to the intransigence, pettiness, and deliberate attempts to undermine the Union as were found, for example, in *General Electric.*

## Conclusion

Looking at the record as a whole, there is substantial evidence supporting the Board's decisions in all three cases. Moreover, those decisions strike us as fair and reasonable. Accordingly, we enforce the Board's petition in Case No. 4106, in which the Board found that the employer had violated § 8(a)(1) by prohibiting the distribution of the scab literature and placing illegal restraints on the employees' right to strike. Sections 8(a)(1) and (5) were also violated by the employer's refusal to provide the Union with the survey results. In Case No. 85-4116, we deny the Union's petition for review and affirm the Board's decision that there was no direct dealing or surface bargaining. In Case No. 85-4126, we enforce the Board's petition as we agree that there was no direct dealing during the Hamilton Standard negotiations. In sum, we enforce the Board's orders and affirm its decisions in both 274 NLRB No. 87 and 274 NLRB No. 163.

---

Rather, it is my belief that the manner and timing of this offer smacks more of a publicity ploy which, when publicized to the employees, was designed to create confusion and to create doubts in the employees' minds as to the efficacy of their representative's bargaining capability."